# EXHIBIT C1



**STATE OF UTAH**
OFFICE OF THE ATTORNEY GENERAL

**SEAN D. REYES**
ATTORNEY GENERAL

| Spencer E. Austin | Daniel Burton | Ric Cantrell | Melissa A. Holyoak | Brian L. Tarbet |
| --- | --- | --- | --- | --- |
| Chief Criminal Deputy | General Counsel | Chief of Staff | Solicitor General | Chief Civil Deputy |

MEMORANDUM TO LEAs

TO: LEAs

FROM: Ashley Biehl, Assistant Attorney General, Education Division

RE: Laws surrounding school libraries

DATE: 05/04/2022

The document outlines the law as it pertains to school library books in Utah. The intent is to provide LEAs with legal guidance. The Utah State Board of Education (USBE) will be releasing a model library policy before the 2022-2023 school year that LEAs may utilize in addition to these principles.

1. <u>**Do students have legal rights regarding access to school library materials?**</u>

Yes. The United States Supreme Court ("SCOTUS") has an extremely long history of recognizing that students have their own First Amendment rights in school. The removal of books from a school library can constitute an official suppression of ideas, in violation of the First Amendment. In *Tinker v. Des Moines*, SCOTUS held that "School officials do not possess absolute authority over their students. Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect."[1] "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."[2]

In *Island Trees v. Pico*, SCOTUS noted that "[l]ocal school boards have broad discretion in the management of school affairs, but such discretion must be exercised in a manner that

---

[1] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511, 89 S. Ct. 733, 739, 21 L. Ed. 2d 731 (1969)

[2] *Shelton v. Tucker*, (364 U.S. 479), at 487 (81 S.Ct. 247, 5 L.Ed.2d 231) (1960)

1

comports with the transcendent imperatives of the First Amendment. … [T]he special characteristics of the school *library* make that environment especially appropriate for the recognition of such rights."[3]

Finally, SCOTUS has stated that "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding."[4] "The school library is the principal locus of such freedom."[5]

### 2. What is the legal standard for assessing what is harmful to minors?

Utah Code Annotated (UCA) 76-10-1201[6] defines materials that are harmful to minors. It is important to note that to be defined as harmful to minors, a book **must meet all three factors** outlined below.

(5)(a) "Harmful to minors" means that quality of any description or representation, in whatsoever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse when it:
  (i) taken as a whole, appeals to the prurient interest in sex of minors;
  (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and
  (iii) taken as a whole, does not have serious value for minors.
(b) Serious value includes only serious literary, artistic, political or scientific value for minors.

This means that a work that contains nudity, sexual conduct, sexual excitement, or sadomasochistic abuse is not harmful to minors on its face. If a work contains one of those things (as defined below), it **MUST** then be considered under this three-factor test. In order to be harmful to minors, the work must contain nudity, sexual conduct, sexual excitement or sadomasochistic abuse **AND** appeal to the prurient interest in sex of minors, be patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors, **AND** lack serious literary, artistic, political, or scientific value.

EXAMPLE: A book on anatomy contains depiction of nudity. This book is not harmful to minors because it does not appeal to the prurient interest in sex of minors, and has serious scientific value for minors.

EXAMPLE: Bram Stoker's *Dracula* contains a scene of sexual conduct. This book is not harmful to minors because it does not appeal to the prurient interest of minors, is not patently

---

[3] *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,* 457 U.S. 853, 853, 102 S. Ct. 2799, 2801, 73 L. Ed. 2d 435 (1982)
[4] *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,* quoting *Keyishian v. Bd. of Regents of Univ. of State of N. Y.,* 385 U.S. 589, 603, 87 S. Ct. 675, 683, 17 L. Ed. 2d 629 (1967)
[5] *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868–69, 102 S. Ct. 2799, 2809, 73 L. Ed. 2d 435 (1982)
[6] Utah Code Ann. § 76-10-1201

offensive to prevailing standards in the adult community when taken as a whole with respect to what is suitable to minors, and it has serious literary value.

EXAMPLE: *Penthouse Magazine* is likely to be considered harmful to minors as it appeals to the prurient interests in sex, would likely be deemed to be patently offensive to prevailing standards in the adult community with respect to what is suitable for minors, and arguably lacks serious literary, artistic, political and scientific value.

      i.     *How is nudity defined?*

UCA 76-10-1201

(10) "Nudity" means:
(a) the showing of the human male or female genitals, pubic area, or buttocks, with less than an opaque covering;
(b) the showing of a female breast with less than an opaque covering, or any portion of the female breast below the top of the areola; or
(c) the depiction of covered male genitals in a discernibly turgid state.

      ii.     *How is sexual conduct defined*?

UCA 76-10-1201

(14) "Sexual conduct" means acts of masturbation, sexual intercourse, or any touching of a person's clothed or unclothed genitals, pubic area, buttocks, or, if the person is a female, breast, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent or actual sexual stimulation or gratification.

      iii.     *How is sexual excitement defined?*

UCA 76-10-1201

(15) "Sexual excitement" means a condition of human male or female genitals when in a state of sexual stimulation or arousal, or the sensual experiences of humans engaging in or witnessing sexual conduct or nudity.

      iv.     *How is sadomasochistic abuse defined*?

UCA 76-10-1201

(13) "Sadomasochistic abuse" means:
(a) flagellation or torture by or upon a person who is nude or clad in undergarments, a mask, or in a revealing or bizarre costume; or
(b) the condition of being fettered, bound, or otherwise physically restrained on the part of a person clothed as described in Subsection (13)(a).

   v.  *What does "prurient interest" mean?*

  SCOTUS has defined prurient interest as: "Material appeals to the prurient interest, for instance, only if it is in some sense erotic."[7]

  The Utah Supreme Court has also clarified that "Material does not evoke a prurient interest unless it has the capacity to provoke 'sexual responses over and beyond those that would be characterized as normal.'"[8] "An expression or depiction must at least be erotic in some significant way to the average person".[9]

   vi.  *What standards must be used to determine if an item has scientific, literary, political or artistic value?*

  To determine whether a book has scientific, literary, political or artistic value, the determining factor is whether a reasonable person would find value in the material when taken as a whole. This factor utilizes a national floor for what constitutes value. Thus, the work must be considered as a whole, and must be looked at through the lens of whether a reasonable person in America would think it has redeeming value.

  In *Ashcroft v. ACLU,* SCOTUS laid out this standard as follows: "[T]he value of [a] work [does not] vary from community to community based on the degree of local acceptance it has won."[10] Rather, the relevant question is "whether a reasonable person would find ... value in the material, taken as a whole."[11] Thus, the serious value requirement "allows appellate courts to impose some limitations and regularity on the definition by setting, *as a matter of law,* a national floor for socially redeeming value."

  UCA 76-10-1227 (c) provides that "(c) A description or depiction of illicit sex or sexual immorality as defined in Subsection (1)(a)(i), (ii), or (iii) has no serious value for minors." Subsection (1)(a)(i-iii) reads: ") "Description or depiction of illicit sex or sexual immorality" means: (i) human genitals in a state of sexual stimulation or arousal; (ii) acts of human masturbation, sexual intercourse, or sodomy; (iii) fondling or other erotic touching of human genitals or pubic region". However, it is important to remember that 76-10-1201 requires all three prongs of the test to be met. Therefore, even if a book does not have literary, scientific,

---

[7] *Ashcroft v. Am. C.L. Union*, 535 U.S. 564, 579, 122 S. Ct. 1700, 1710, 152 L. Ed. 2d 771 (2002).

[8] *City of St. George v. Turner*, 860 P.2d 929, 934 (Utah 1993), citing *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 498, 105 S.Ct. 2794, 2799, 86 L.Ed.2d 394 (1985).

[9] *City of St. George v. Turner*, 860 P.2d 929, 934 (Utah 1993), citing *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)

[10] *Ashcroft v. Am. C.L. Union, citing Pope v. Illinois*, 481 U.S. 497, 500, 107 S. Ct. 1918, 1921, 95 L. Ed. 2d 439 (1987)

[11] *Id.,* at 501, 107 S.Ct. 1918.

political or artistic value for the above reasons, it must also patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and appeal to the prurient interests in sex of minors, in order to be harmful to minors.

      vii.    *Does this require a book to be considered as a whole when assessing suitability?*

Yes. The third prong of "harmful to minors" requires a book to lack serious artistic, scientific, political, or literary value. SCOTUS has defined this criteria as "whether a reasonable person would find ... value in the material, taken as a whole."[12] Therefore, the book must be considered in its entirety when determining whether it has scientific, literary, artistic, or political value.

Additionally, UCA 76-10-1227(2)(a) provides that: "Subject to Subsection (2)(c), this section and Section 76-10-1228 do not apply to any material which, when taken as a whole, has serious value for minors."

Finally, the Utah Supreme Court has held that "under Supreme Court caselaw, an obscenity analysis must focus on the work 'taken as a whole'".[13]

      viii.    *Can books be banned if, taken as a whole, they are vulgar or educationally unsuitable?*

Yes. SCOTUS has held that "an unconstitutional motivation would *not* be demonstrated if it were shown that petitioners had decided to remove the books at issue because those books were pervasively vulgar. …[I]f it were demonstrated that the removal decision was based solely upon the "educational suitability" of the books in question, then their removal would be "perfectly permissible."[14]

### 3. <u>Are library books and books assigned as apart of classroom curricula subject to the same constitutional standard?</u>

No. Library Books are given significantly wider protection under the First Amendment than books that are assigned as a part of school curriculum.

"Petitioners might well defend their claim of absolute discretion in matters of *curriculum* by reliance upon their duty to inculcate community values. But we think that petitioners' reliance upon that duty is misplaced where, as here, they attempt to extend their claim of absolute discretion beyond the compulsory environment of the classroom, into the

---

[12] *Id*.

[13] *State v. Watts*, 498 P.3d 365, 374-75 (Utah 2021), citing *Miller v. California*, 413 U.S. 15, 18 (1973)

[14] *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 871, 102 S. Ct. 2799, 2810, 73 L. Ed. 2d 435 (1982)

school library and the regime of voluntary inquiry that there holds sway."[15]

### 4. What factors may NOT go into a book removal?

Books may not be removed because they contain ideas that local school boards disagree with based upon: politics, nationalism, religion, or other matters of opinion.

"In brief, we hold that local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." Such purposes stand inescapably condemned by our precedents."[16]

"Petitioners rightly possess discretion to determine the content of their school libraries. But that discretion may not be exercised in a narrowly partisan or political manner."[17]

### 5. Does HB 374 change the standard for school library books?

No. HB 374 prohibits sensitive materials in the school setting. HB 374 defines sensitive material as "an instructional material that is pornographic or indecent material as that term is defined in Section 76-10-1235." Section 76-10-1235 defines pornographic or indecent material as: "i) defined as harmful to minors in Section 76-10-1201; ii) described as pornographic in Section 76-10-1203; or (iii) described in Section 76-10-1217."

This section references back to 76-10-1201, which, as noted above in question 2, requires the three prong test under 76-10-1201(5)(a) to be utilized in determining whether a material is harmful to minors. Therefore, this three-prong test under 76-10-1201(5)(a) must always be utilized when assessing whether a library book is 'sensitive material'. It also references UCA 76-10-1203, which provides the same test as 76-10-1201(5), with the difference that the first two prongs assess what appeals to the prurient interests in sex or is patently offensive to adults, rather than minors. UCA 76-10-1203 essentially repeats the same three-prong test, but focuses on adults, rather than minors.

### 6. Are library books included in HB 374?

Yes, though HB 374 does not change the standard that is used to assess school library books, which is noted above in question 2, and can be found under UCA 76-10-1201.

HB 374 defines instructional materials as:

---

[15] *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,* 457 U.S. 853, 869, 102 S. Ct. 2799, 2809, 73 L. Ed. 2d 435 (1982)

[16] *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872, 102 S. Ct. 2799, 2810, 73 L. Ed. 2d 435 (1982) citing West Virginia Board of Education v. Barnette, 319 U.S., at 642, 63 S.Ct., at 1187.

[17] *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870, 102 S. Ct. 2799, 2810, 73 L. Ed. 2d 435 (1982)

53G-10-103(1)(a)

(i) "Instructional material" means a material, regardless of format, used:

(A) as or in place of textbooks to deliver curriculum within the state curriculum framework for courses of study by students; or

(B) to support a student's learning in the school setting.

(ii) "Instructional material" includes reading materials, handouts, videos, digital materials, websites, online applications, and live presentations.

...

53G-10-103(f) (i) "School setting" means, for a public school:

(A) in a classroom;

(B) in a school library; or

(C) on school property

53G-10-103(g)

(i) "Sensitive material" means an instructional material that is pornographic or indecent material as that term is defined in Section 76-10-1235.

(ii) "Sensitive material" does not include an instructional material:

(A) that an LEA selects under Section 53G-10-402;

(B) for medical courses;

(C) for family and consumer science courses; or

(D) for another course the state board exempts in state board rule.

As noted in question 5, HB 374 defines sensitive material as "an instructional material that is pornographic or indecent material as that term is defined in Section 76-10-1235." Section 76-10-1235 defines pornographic or indecent material as: "i) defined as harmful to minors in Section 76-10-1201; ii) described as pornographic in Section 76-10-1203; or (iii) described in Section 76-10-1217."

Section 76-10-1201, requires the three prong test under 76-10-1201(5)(a) to be utilized in determining whether a material is harmful to children, and section 76-10-1203 essentially provides the same test. Therefore, this three-prong test under 76-10-1201(5)(a) must be utilized when assessing whether a library book is 'sensitive material'.

### 7. <u>What should be done with a book while it is pending review?</u>

There is no specific law stating whether books must be left in the library when facing a challenge. However, leaving books on the shelves while pending review helps to ensure that schools are not engaging in prior restraint. As noted in question 1, students have extensive first amendment rights in school, and the removal of a book from a school library can constitute a suppression of ideas, in violation of their first amendment rights. Prior restraint is a legal doctrine in first amendment law that is violated when the government prevents speech before it occurs. In this case, removing books before a determination is made as to whether they meet the definition of "harmful to children" runs the risk of violating students' first amendment rights to study and inquire, via prior restraint.

SCOTUS has a long history of disfavoring prior restraints. "Prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights," wrote then-Chief Justice Warren Burger. SCOTUS has held that "*[a]ny* system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity."[18] They further noted that "[t]he special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment."[19] Nothing in this section prohibits a book's immediate removal from circulation if the book meets all three prongs of the 'harmful to minors' test under 76-10-1201.

---

[18] *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963)
[19] *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390, 93 S. Ct. 2553, 2561, 37 L. Ed. 2d 669 (1973)