DAVID C. REYMANN (8495)
JASCHA K. CLARK (16019)
**PARR BROWN GEE & LOVELESS**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
(801) 532-7840
dreymann@parrbrown.com
jclark@parrbrown.com

JASON M. GROTH (16683)
THOMAS J. FORD (19795)
MASAMI T. KANEGAE (20270)
ABIGAIL COOK (19781)
**ACLU OF UTAH FOUNDATION, INC.**
311 South State Street, Suite 310
Salt Lake City, Utah 84111
(801) 521-9862
jgroth@acluutah.org
tford@acluutah.org
mkanegae@acluutah.org
acook@acluutah.org

*Attorneys for Plaintiffs*

RICHARD A. VAN WAGONER (4690)
MELINDA K. BOWEN (13150)
**SPENCER FANE LLP**
10 Exchange Place, 11th Floor
Salt Lake City, Utah 84145
(801) 521-9000
rvanwagoner@spencerfane.com
mbowen@spencerfane.com

DAVID M. GIVEN*
**COUNSEL LLP**
230 California Street, Suite 201
San Francisco, California 94111
(415) 227-0555
dgiven@counselllp.com

*Admitted Pro Hac Vice*

*Attorney for Plaintiff Caged Bird Legacy*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **THE KURT VONNEGUT ESTATE; CAGED BIRD LEGACY, LLC; ELANA K. ARNOLD; ELLEN HOPKINS; AMY REED; STUDENT DOE #1** (a minor), by and through their parent, **PARENT DOE #1**; and **STUDENT DOE #2** (a minor) by and through their parent, **PARENT DOE #2**,<br><br>    Plaintiffs,<br><br>v.<br><br>**ATTORNEY GENERAL DEREK BROWN**, in his official capacity as | **FIRST AMENDED COMPLAINT**<br><br>Case No. 2:26-cv-00010<br><br>Magistrate Judge Cecilia Romero |

attorney general for the State of Utah;
**UTAH STATE BOARD OF EDUCATION**, a Utah state government agency; **BOARD MEMBER AMANDA BOLLINGER**, in her official capacity; **BOARD MEMBER RANDY BOOTHE**, in his official capacity; **BOARD MEMBER JOANN BRINTON**, in her official capacity; **BOARD MEMBER CHRISTINA BOGGESS**, in her official capacity; **BOARD MEMBER CINDY BISHOP DAVIS**, in her official capacity; **BOARD MEMBER JENNIE EARL**, in her official capacity; **BOARD MEMBER EMILY GREEN**, in her official capacity; **BOARD MEMBER ROD HALL**, in his official capacity; **BOARD MEMBER MOLLY HART**, in her official capacity; **BOARD MEMBER MATT HYMAS**, in his official capacity; **BOARD MEMBER COLE KELLEY**, in his official capacity; **BOARD MEMBER JOSEPH KERRY**, in his official capacity; **BOARD MEMBER CAROL BARLOW LEAR**, in her official capacity; **BOARD MEMBER SARAH REALE**, in her official capacity; and **BOARD MEMBER LEANN WOOD**, in her official capacity; **DAVIS SCHOOL DISTRICT; DAVIS SCHOOL DISTRICT SUPERINTENDENT, DAN LINFORD**, in his official capacity; **SALT LAKE CITY SCHOOL DISTRICT; SALT LAKE CITY SCHOOL DISTRICT SUPERINTENDENT, ELIZABETH GRANT**, in her official capacity; **WASHINGTON SCHOOL DISTRICT**, and **WASHINGTON SCHOOL DISTRICT SUPERINTENDENT, RICHARD HOLMES,** in his official capacity;

**DAVIS SCHOOL DISTRICT BOARD OF EDUCATION; DAVIS SCHOOL DISTRICT BOARD OF EDUCATION MEMBER BRIGIT GERRAD**, in her official capacity;
**DAVIS SCHOOL DISTRICT BOARD OF EDUCATION MEMBER EMILY PRICE**, in her official capacity;
**DAVIS SCHOOL DISTRICT BOARD OF EDUCATION MEMBER ALISA MERCER**, in her official capacity;
**DAVIS SCHOOL DISTRICT BOARD OF EDUCATION MEMBER JOANI STEVENS**, in her official capacity;
**DAVIS SCHOOL DISTRICT BOARD OF EDUCATION MEMBER JULIE POWELL**, in her official capacity;
**DAVIS SCHOOL DISTRICT BOARD OF EDUCATION MEMBER MICHELLE BARBER**, in her official capacity;
**DAVIS SCHOOL DISTRICT BOARD OF EDUCATION MEMBER KRISTEN HOGAN**, in her official capacity; **SALT LAKE CITY SCHOOL DISTRICT BOARD OF EDUCATION; SALT LAKE CITY SCHOOL DISTRICT BOARD OF EDUCATION MEMBER BRYCE WILLIAMS**, in his official capacity;
**SALT LAKE CITY SCHOOL DISTRICT BOARD OF EDUCATION MEMBER CHARLOTTE FIFE-JEPPERSON**, in her official capacity;
**SALT LAKE CITY SCHOOL DISTRICT BOARD OF EDUCATION MEMBER ASHLEY ANDERSON**, in her official capacity;
**SALT LAKE CITY SCHOOL DISTRICT BOARD OF EDUCATION MEMBER NATE SALAZAR**, in his official capacity;
**SALT LAKE CITY SCHOOL DISTRICT BOARD OF EDUCATION**

**MEMBER ANNIE ROMANO**, in her official capacity;
**SALT LAKE CITY SCHOOL DISTRICT BOARD OF EDUCATION MEMBER BRYAN JENSEN**, in his official capacity;
**SALT LAKE CITY SCHOOL DISTRICT BOARD OF EDUCATION MEMBER AMANDA LONGWELL**, in her official capacity;
**WASHINGTON SCHOOL DISTRICT BOARD OF EDUCATION**;
**WASHINGTON SCHOOL DISTRICT BOARD OF EDUCATION MEMBER DAVID STIRLAND**, in his official capacity;
**WASHINGTON SCHOOL DISTRICT BOARD OF EDUCATION MEMBER LARENE COX**, in her official capacity;
**WASHINGTON SCHOOL DISTRICT BOARD OF EDUCATION MEMBER CRAIG SEEGMILLER**, in his official capacity;
**WASHINGTON SCHOOL DISTRICT BOARD OF EDUCATION MEMBER BURKE STAHELI**, in his official capacity;
**WASHINGTON SCHOOL DISTRICT BOARD OF EDUCATION MEMBER CRAIG HAMMER**, in his official capacity;
**WASHINGTON SCHOOL DISTRICT BOARD OF EDUCATION MEMBER HEIDI GUNN**, in her official capacity;
**WASHINGTON SCHOOL DISTRICT BOARD OF EDUCATION MEMBER RON WADE**, in his official capacity;
**WASHINGTON SCHOOL DISTRICT BOARD OF EDUCATION MEMBER BRENT BILLS**, in his official capacity;

Defendants.

*"There is more than one way to burn a book. And the world
is full of people running about with lit matches."*

— Ray Bradbury, *Fahrenheit 451* (1979 Coda)

## BACKGROUND AND NATURE OF THE CASE

1.      Plaintiffs—the estates of two of the most influential twentieth century American writers, three award winning authors, and two Utah public high school students—bring this action to challenge the portions of a Utah law (the "**Book Removal Law**") that function as a modern-day book burning.

2.      The Book Removal Law, codified at Section 53G-10-103 of the Utah Code, is unmoored from the First Amendment and requires Utah's Local Education Agencies ("**LEAs**") to strip their school libraries of any book that contains even a single description or depiction of sex, no matter how fleeting, no matter its context, and no matter its literary, artistic, political, or scientific value.

3.      The Book Removal Law also never asks the most basic question: appropriate for whom? A kindergartner learning to sound out words and a twelfth-grader weeks from graduation are treated identically. As described below, once a book is labeled "sensitive," it must be taken from the shelf, including the high school library. There is no recognition that a seventeen-year-old preparing for college, navigating identity, relationships, and the realities of adulthood stands in a fundamentally different place than a five-year-old.

4.      This creates an absurd mismatch with other parts of Utah's own legal standards. State law permits sixteen-year-olds to consent to certain sexual activity. Yet the same students whom Utah trusts to make intimate, real-world decisions about their bodies are, under the Book Removal Law, barred from accessing books that contain a

mere single passage describing the very conduct in which is lawful for them to engage. The Book Removal Law tells them: you are mature enough to do this, but not mature enough to read about it.

5.      The Book Removal Law as currently enacted is attached as Exhibit A1.

6.      This action concerns the portions of the Book Removal Law, as amended by House Bill 29,[1] that require all LEAs in Utah to automatically ban and remove from their library shelves swaths of books, without consideration of those books' value as a whole, in violation of the First and Fourteenth Amendments to the United States Constitution. This lawsuit does not challenge any of the numerous other provisions of the Book Removal Law.

7.      First, Plaintiffs challenge the Book Removal Law's "objective sensitive material" mandate that prohibits in all school settings (including libraries) any book that contains a single description or depiction of sex under the non-discretionary standards described in subsections 76-5c-207(1)(a)(i)(A),(B), or (C) of Utah's criminal code. UTAH CODE ANN. § 53G-10-103(1)(e).[2] This Complaint refers to this non-discretionary mandate as the "**Per Se Ban**."

8.      Borrowed from Utah's criminal statute regarding "Indecent public displays in the presence of a minor," the Per Se Ban declares by legislative fiat that any instructional material containing a single description or depiction of: "(A) human genitals in a state of sexual stimulation or arousal; (B) acts of human masturbation, sexual

---

[1] H.B. 29, Gen. Sess. (2024) (codified at UTAH CODE ANN. § 53G-10-103).
[2] For clarity, Plaintiffs cite to the current sections and numbering of the Utah Code, as amended by the 2025 legislative session, except as expressly noted.

intercourse, or sodomy; [or] (C) fondling or other erotic touching of the human buttock or female breast" constitutes pornographic or indecent material, and is thus banned. *Id.*; UTAH CODE ANN. § 76-5c-207(1)(a)(i)(A)-(C).

9.      The Per Se Ban automatically prohibits this entire category of books for all grades—from kindergarten through twelfth grade—without allowing LEAs to even consider the value of any individual book as a whole, in violation of longstanding First Amendment jurisprudence. *Miller v. California*, 413 U.S. 15, 24 (1973); *see also Penguin Random House LLC v. Gibson*, 796 F. Supp. 3d 1052, 1075–76 (M.D. Fla. 2025) (holding that the concept of obscenity or unprotected matter may vary according to the group to whom the questionable material is directed and that, when applying the obscenity analysis to minors, courts employ the *Miller*-for-minors test by modifying the standard *Miller* prongs to account for minors).

10.      Second, Plaintiffs challenge the Book Removal Law's statewide ban provision that requires every LEA to automatically ban and remove from their libraries any book that is deemed "objective sensitive material" by at least three LEAs or two LEAs and five charter schools (the "**Statewide Ban**"). UTAH CODE ANN. § 53G-10-103(7)(b). The Statewide Ban applies even if an LEA has already approved the book for library placement or received no complaints about the book.

11.      To date, hundreds of books have been removed from individual school libraries across Utah pursuant to the Per Se Ban, and of those, 22 titles have been banned in every LEA and public school library pursuant to the Statewide Ban.

12.     Among the books removed are award-winning and best-selling titles such as Kurt Vonnegut's New York Times Best Seller, *Slaughterhouse-Five*; Nobel Prize winner Toni Morrison's *The Bluest Eye*; Khaled Hosseini's New York Times Best Seller, *The Kite Runner*; Elana K. Arnold's National Book Award finalist in young people's literature, *What Girls Are Made Of*; and Maya Angelou's *I Know Why the Caged Bird Sings*, a Pulitzer Prize nominee, National Medal of Arts awardee, and Presidential Medal of Freedom recipient. Many or all Utah students are denied access to these classic, critically acclaimed novels in their school libraries absent any consideration of the books' literary, scientific, medical, artistic, or political value and without consideration of the age of the individual readers simply because the books describe what Utah's legislature has defined as "sexual conduct".

13.     The right to speak and the right to read are inextricably intertwined. Just as "the Supreme Court has recognized that authors and publishers have standing to challenge regulations that prohibit them from reaching their intended audience or impose financial disincentives on their work," *Penguin Random House, LLC, v. Robbins*, 774 F. Supp. 3d 1001, 1014 (S.D. Iowa 2025) (citing *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989)), "the Constitution protects the right to receive information and ideas," a right that extends to students with respect to school library materials, *Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867–68 (1982) (plurality opinion) (citation modified).

14.     Courts evaluating the removal of school library books apply standards consistent with the rules governing speech restrictions in nonpublic forums. Accordingly, the State must show that any content-based restriction is "reasonable in light of the

purpose served by the forum." *Gibson,* 2025 WL 2408178, at \*13 (citation modified) (citing *Minn. Voters All. v. Mansky,* 585 U.S. 1, 13 (2018)).

15.     Here, that means examining whether the challenged provisions of the Book Removal Law are reasonable in light of the purpose of public school libraries. According to the Utah State Board of Education, Utah's school library programs exist "to recognize individual students' interests and needs and provide materials in a variety of formats, genres, and languages, at varied reading levels."[3] Utah's Core Standards for Library Media further explain that, among other things, school libraries provide students with the lifelong skills of selecting information from a wide variety of sources, assessing its worth, and applying newfound knowledge to problems, as well as preparing students for learning, doing, and problem solving in college, career, and throughout life.

16.     As the Supreme Court has recognized, overbreadth challenges are an important tool to protect First Amendment rights when a law restricts and chills a substantial amount of protected speech. *See*, *e.g.*, *Ashcroft v. Free Speech Coal.,* 535 U.S. 234, 244 (2002) ("The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere."); *Virginia v. Hicks,* 539 U.S. 113, 119 (2003) (Scalia, J.) (explaining that facial challenges are important because "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to

---

[3]     Utah State Bd. of Educ., 2024 Ann. Rep. 39 (Jan. 7, 2024), https://schools.utah.gov/superintendentannualreport/_superintendentannualreport_/2024AnnualReport.pdf.

abstain from protected speech[,] harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas").

17.    Proponents of the Book Removal Law will claim these sweeping prohibitions are necessary to keep pornography out of schools. This is not so. Prior Utah law already forbade obscene and pornographic materials in LEAs and school libraries under the *Miller*-for-minors standard.

18.    No one disputes that pornography and obscene material can and should be excluded from school libraries.

19.    By design, the Per Se and Statewide Bans go further than the Constitution allows. They were drafted to remove books that are *not* pornographic or obscene under the *Miller*-for-minors standard, i.e. books that have value as a whole and are constitutionally protected from removal by the First Amendment. These prohibitions sweep away Pulitzer Prize winners, National Book Award finalists, New York Times Best Sellers, and critically acclaimed works by branding them "indecent" and "pornographic" simply because they contain a sexual reference, regardless of context or a book's value as a whole. As a result, the law makes no distinction between a five-year-old learning to read and a seventeen-year-old preparing for college—once a book contains even a fleeting reference to sexual conduct, it must be stripped from every shelf, including the high school library.

20.    For decades, Utah's school libraries have been curated by trained librarians and educators who know their students and communities best. Utah's librarians and educators are guided by professional norms and best practices, ensuring that their

schools' library collections are age-appropriate, educationally sound, and expansive enough to expose students to the diverse ideas that form the bedrock of a meaningful education.

21.    That professional stewardship was reinforced by comprehensive processes, national standards, and safeguards embedded in the publishing industry itself. Librarians and LEAs did not stock shelves haphazardly; they selected materials vetted through established processes that kept pornography and obscenity out of school libraries. These protections meant students had access to literature broad enough to challenge and inspire them, but always within age-appropriate and constitutional bounds.

22.    Above all, parents retained ultimate authority over their *own* children's reading. At any time, a parent could request that their child be restricted from particular books, and those requests were *always* honored—without limiting the rights of other families.

23.    The challenged provisions of the Book Removal Law do not, as proponents claim, protect children from pornography. The Per Se Ban and Statewide Ban are overbroad, content-based censorship that violate the First Amendment by limiting the ideas, information, and lived experiences accessible in Utah's school libraries based on the personal preferences of the Legislature.

24.    The removal of books pursuant to the Per Se and Statewide Bans constitutes blatant violations of the free speech rights of students and authors alike.

25.    Accordingly, Plaintiffs bring this facial challenge to the Per Se and Statewide Bans of the Book Removal Law and ask this Court to strike down those portions of the law

as unconstitutional under the First and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

26.    This Court has both the authority and the responsibility to address this constitutional violation.

27.    This action seeks relief under 42 U.S.C. §§ 1983 and 1988 for Defendants' violation of constitutional rights protected by the First and Fourteenth Amendments to the United States Constitution.

28.    The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

29.    Venue is proper in this district under 28 U.S.C. § 1391(b) because multiple defendants reside here, all defendants are residents of Utah, and the constitutional violations giving rise to Plaintiffs' claims occurred and continue to occur within this district in the very school libraries and classrooms where Utah students should be free to explore ideas and expand their understanding of the world.

## PARTIES

**A.  Plaintiffs**

30.    The Plaintiffs in this case represent both sides of the fundamental right at stake: the right to speak and the right to receive information and ideas.

### Author Plaintiffs

31.    The Author Plaintiffs include both living authors and entities that hold and protect the literary rights and legacies of deceased authors.

32.    The Kurt Vonnegut Estate (the **"Vonnegut Estate"**) is comprised of the author's children and beneficiaries Nanette Vonnegut, Lily Vonnegut, Mark Vonnegut,

and Edith Vonnegut-Squibb. Their father's book, *Slaughterhouse-Five*, has been labeled "pornographic" and removed from Washington School District library shelves due to the Book Removal Law's Per Se Ban.

33.   Kurt Vonnegut was a highly-acclaimed, widely-published, and award-winning American author and playwright. He published fourteen novels, including New York Times Best Sellers *Slaughterhouse-Five* and *Breakfast of Champions*. He also taught writing courses at the University of Iowa Writer's Workshop, Harvard University, and the City University of New York. Vonnegut's legacy lives on through his impactful works and through institutions like the Kurt Vonnegut Museum and Library, which includes Vonnegut Estate members on its Board of Directors and Honorary Board.

34.   Vonnegut was also a World War II veteran. His military experience—including his capture by the German army and experiencing the Dresden fire-bombing—influenced his critically acclaimed novel *Slaughterhouse-Five*. The novel, considered an American classic, explores the horror and trauma of war. In his plea to readers, Vonnegut explained that, "I have told my sons that they are not under any circumstances to take part in massacres, and that the news of massacres of enemies is not to fill them with satisfaction or glee. I have also told them not to work for companies which make massacre machinery, and to express contempt for people who think we need machinery like that."

35.   *Slaughterhouse-Five* is recognized as one of the most important anti-war novels ever written. Semi-autobiographical, the novel follows the life experiences of Billy Pilgrim, from his early years to his time as an American soldier during World War II through his post-war years. The novel received widespread, international acclaim and

earned accolades including Hugo Award Nominee (Best Novel, 1970), Nebula Award Nominee (Best Novel, 1970), Time Magazine's 100 best English Language Novels (1923–2005), and Modern Library's 100 Best Novels of the 20th Century (#18 on the editors' list, #23 on the readers' list). While originally published in 1969, it has sold approximately 125,000 copies annually in the twenty-first century.[4]

36.    In 1973, Vonnegut himself addressed a high school that banned and literally burned copies of *Slaughterhouse-Five*. In a letter to the head of the school board, he wrote, "If you were to bother to read my books, to behave as educated persons would, you would learn that they are not sexy, and do not argue in favour of wildness of any kind. They beg that people be kinder and more responsible than they often are… It was a rotten lesson you taught young people in a free society when you denounced and then burned books – books you hadn't even read. You should also resolve to expose your children to all sorts of opinions and information, in order that they will be better equipped to make decisions and to survive."[5]

37.    The removal and banning of *Slaughterhouse-Five* pursuant to the Per Se Ban, along with the stigma associated with his published works being labeled as "pornographic" or "indecent" by legislative mandate, causes the Vonnegut Estate professional harm and harms Vonnegut's legacy. Moreover, it prevents Vonnegut from reaching his intended audiences and deprives his intended audiences of access to

---

[4] Tom Roston, *On Slaughterhouse-Five, the "Ultimate PTSD Novel,"* LITERARY HUB (Nov. 10, 2021), https://lithub.com/on-slaughterhouse-five-the-ultimate-ptsd-novel/.
[5] Kurt Vonnegut, *Books into Ashes*, N.Y. TIMES (Feb. 7, 1982), https://www.nytimes.com/1982/02/07/opinion/books-into-ashes.html.

constitutionally protected literature written to help young adults understand and navigate the world "in order that they will be better equipped to make decisions and to survive."

38.    Plaintiff Caged Bird Legacy, LLC ("**Caged Bird Legacy**"), is the legal entity representing Dr. Maya Angelou's beneficiaries and literary assets.

39.    Dr. Maya Angelou was an American poet, memoirist, civil rights activist, and cultural icon who received international acclaim and wrote 30 best-selling books, all or almost all of which are still in print. Over her lifetime (she passed in 2014 at the age of 86), Dr. Angelou was awarded multiple accolades, including the Presidential Medal of the Arts in 2000 and the Presidential Medal of Freedom in 2010.[6] She was also awarded the Literarian Award for Outstanding Service to the American Literary Community, a lifetime achievement award by the National Book Foundation.[7] President Barack Obama stated of Dr. Angelou, "Over the course of her remarkable life, Maya was many things – an author, poet, civil rights activist, playwright, actress, director, composer, singer and dancer. But above all, she was a storyteller – and her greatest stories were true. A childhood of suffering and abuse actually drove her to stop speaking – but the voice she found helped

---

[6]  *Remembering and Celebrating the Life of Dr. Maya Angelou*, THE WHITE HOUSE (May 28, 2014), https://obamawhitehouse.archives.gov/blog/2014/05/28/remembering-and-celebrating-life-dr-maya-angelou.
[7]  *Literarian Award for Outstanding Service to the Am. Literary Cmty.*, NAT'L BOOK FOUND., https://www.nationalbook.org/programs/literarian/ - tab-2 (last visited Feb. 5, 2026).

generations of Americans find their rainbow amidst the clouds, and inspired the rest of us to be our best selves."[8]

40.    Dr. Angelou published her seminal autobiographical work, *I Know Why the Caged Bird Sings*, in 1969. It tells her story growing up as a young Black woman in the American South and the adversity she faced as a child experiencing racism and trauma. Through literature, self-love, and kindness of others, Dr. Angelou becomes a confident young mother who understands that her resilience is rooted in a tradition of Black American women. Reflecting on the deep emotional weight of silence and suppressed truths, rooted in both personal trauma and the societal degradation imposed on a young Black woman in the Jim Crow South, Dr. Angelou teaches us, "there is no greater agony than bearing an untold story inside of you."

41.    Dr. Angelou was also a Pulitzer Prize nominee and a National Medal of Arts awardee, and *I Know Why the Caged Bird Sings* was nominated for a National Book Award in 1970 and is a *New York Times* best-seller.[9]

42.    *I Know Why the Caged Bird Sings* has consistently been targeted by book bans since its publication, and it was one of the hundred most banned books in the previous decade.[10] Regarding her books being banned, Dr. Angelou said, "I'm always sorry

---

[8] *Statement by the President on the Passing of Maya Angelou*, THE WHITE HOUSE (May 28, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/05/28/statement-president-passing-maya-angelou.

[9] *Published More Than 50 Years Ago, 'I Know Why the Caged Bird Sings' Launched a Revolution*, SMITHSONIAN MAG. (Jan. 2020), https://www.smithsonianmag.com/arts-culture/published-50-years-ago-i-know-why-caged-bird-sings-launched-revolution-180973719/.

[10] *Top 100 Most Frequently Challenged Books: 2010-2019*, AM. LIB. ASS'N (Sep. 9, 2020), https://www.ala.org/bbooks/frequentlychallengedbooks/decade2019.

that people ban my books. Many times I've been called the most banned. And many times my books are banned by people who never read two sentences. I feel sorry for the young person who never gets to read."[11]

43.    The removal and banning of *I Know Why the Caged Bird Sings,* pursuant to the Per Se Ban, along with the stigma associated with published works being labeled as "pornographic" or "indecent" by legislative mandate, causes Caged Bird Legacy professional harm and harms Dr. Angelou's legacy. Moreover, it prevents Dr. Angelou from reaching her intended audiences and deprives her intended audiences of access to constitutionally protected literature, depriving young readers of the inspirational messages of perseverance, understanding, and hope in difficult circumstances.

44.    Elana K. Arnold, Ellen Hopkins, and Amy Reed (together with the Vonnegut Estate and Caged Bird Legacy, the "**Author Plaintiffs**") are authors whose critically acclaimed and award-winning works have been stripped from school library shelves and branded as "pornographic" as a result of the Book Removal Law's Per Se and Statewide Bans.

---

[11] *Maya Angelou: 1928-2014*, Pᴇɴ Aᴍ. (May 28, 2014), https://pen.org/press-release/maya-angelou-1928-2014/.

45.    Elana K. Arnold, Ellen Hopkins, and Amy Reed are three internationally recognized authors whose books have been purged from Utah schools not for lacking literary merit, but because they contain honest portrayals of the human experience that include references to sexuality. These authors have dedicated their careers to writing for young adults and crafting stories that help teenagers navigate complex issues like identity, sexual violence and trauma, addiction, relationships, and personal agency.

46.    Plaintiff Elana K. Arnold ("**Ms. Arnold**") is a California-based author who holds degrees in Comparative Literature, English, and Creative Writing from the University of California system, where she also taught courses in Creative Writing and Adolescent Literature. Over her career, Ms. Arnold has authored more than 30 published works for and about children and teens, many of which have earned significant recognition and acclaim. Her works have been celebrated by the American Library Association (the "**ALA**"), the Young Adult Library Services Association, and the Junior Library Guild for her realistic exploration of themes relevant to young adult readers.

47.    Ms. Arnold's *What Girls Are Made Of*, first published by Lerner Publishing Group in 2017, tells the story of young womanhood, self-love, and fulfillment, earning recognition as a 2017 National Book Award finalist in the young people's literature category.[12] Her young adult novel, *Damsel*, first published by Balzer & Bray in October of 2018, is a feminist reworking of a traditional fairytale that follows a prince who must conquer a dragon and rescue a "damsel" to become king. *Damsel* explores sexual assault,

---

[12] *What Girls Are Made Of*, NAT'L BOOK FOUND. (2017), https://www.nationalbook.org/books/what-girls-are-made-of/.

rape culture, misogyny, and the harm of patriarchy and is recognized by the American Library Association ("ALA") as a 2019 Printz Honor book, a national award recognizing books that exemplify literary excellence in young adult literature.[13]

48.    Ms. Arnold's books *What Girls Are Made Of* and *Damsel* are banned from every public school library in Utah pursuant to the Per Se and Statewide Bans. As Ms. Arnold explains, we do not live in a world where no one experiences sexual assault, gaslighting, or abuse. These issues are real concerns for teens today and pretending otherwise does them a disservice. Teen girls do not need us to protect them from the truths of our world. They need us to arm them with knowledge, belief in their experiences, and our stories.

49.    Based in Missouri, Plaintiff Ellen Hopkins ("**Ms. Hopkins**") is an international award winning and #1 New York Times best-selling author. She has authored 14 young adult novels that tackle challenging themes including addiction, mental illness, and abuse. Ms. Hopkins was recognized with the Silver Pen Award from the Nevada Writers Hall of Fame in 2006 and was inducted into the Nevada Writers Hall of Fame in 2015.[14] Her novels have been celebrated by the ALA, the Young Adult Library Services Association, and the International Reading Association, for her realistic exploration of themes relevant to young adult readers, earning widespread acclaim and

---

[13] *Damsel*, AM. LIBR. ASS'N (January 30, 2019), https://www.ala.org/winner/damsel.
[14] *Ellen Hopkins*, NEV. WRITERS HALL OF FAME, https://library.unr.edu/nevada-writers-hall-of-fame/ellen-hopkins (last visited Dec. 17, 2025).

accolades including #1 New York Times Best Sellers and frequent appearances on "best of" lists.[15]

50.    *Tricks*—first published in August of 2009 by Simon & Schuster's Children's Division, Margaret K. McElderry Books—is a story about young adults figuring out what love and sex are all about that follows five teenagers from different parts of the country living their lives as best they can, but all searching for freedom, safety, community, family, and love. *Tricks,* debuted at #1 on the New York Times Best Seller List in its first week, earned literary acclaim as a Goodreads Choice Award Nominee for Young Adult Fiction and on the New York Public Library's best book for teens and ALA Rainbow list selections.[16] *Tilt,* first published in February of 2014 by Simon & Schuster's Children's Division, Margaret K. McElderry Books, is a story about three teens that explores the ways we find the strength we need to hold on when our world's been "tilted" off its axis. *Tilt* has been recognized as a Young Adult Library Services Association Teens' Top Ten Nominee and International Literary Associations Young Adult list. *Fallout,* first published in August of 2013 by Margaret K. McElderry Books, explores both the personal fallout of drug abuse and how one person's drug addiction can also cause generational harm. The gripping conclusion to the New York Times bestselling *Crank* trilogy, *Fallout* is inspired by Ms. Hopkins' own daughter's struggle with methamphetamine and is a testament to the harsh reality that addiction is never just one person's problem. Ms. Hopkin's story is

---

[15] *Id.*

[16] *Tricks*, SIMON & SCHUSTER, https://www.simonandschuster.com/books/Tricks/Ellen-Hopkins/9781481498241 (last visited Dec. 17, 2025).

so compelling that it is required reading in many high schools, as well as many drug and drug court programs.

51.     Ms. Hopkins' *Tricks*, *Tilt*, and *Fallout* are banned from every public school in Utah pursuant to the Per Se and Statewide Bans, despite their widespread critical acclaim and their role in helping young people understand and process difficult experiences.

52.     Plaintiff Amy Reed ("**Ms. Reed**") lives in North Carolina and earned her master's degree in fine arts from the New College of California. She has published eleven books that have been recognized by the ALA and praised by *Kirkus Reviews* for their "highly nuanced and self-reflective narrative" approach to challenging topics. Ms. Reed draws from her own experiences with addiction and recovery, offering what she describes as advice to follow your heart, choose right even if no one else does, and be kind.

53.     Ms. Reed's *Beautiful* is a young adult novel that follows Cassie, a teenager grappling with self-worth, substance abuse, and the pressures of toxic relationships, including sexual dynamics that reflect the complexities of adolescence. *The Nowhere Girls* is a young adult novel that centers on three teenage girls who unite to confront rape culture and sexual assault in their high school, inspired by real-world events involving a point-scoring system among boys for sexual encounters. Both novels have been lauded for their emotional depth and relevance, with *The Nowhere Girls* earning acclaim as an ALA Best Book for Young Adults for its powerful depiction of solidarity and resistance against sexual violence. These works provide critical narratives that empower students to address issues like consent, trauma, and peer pressure, fostering empathy and agency.

54.     Ms. Reed's *Beautiful* and *The Nowhere Girls* have been removed from public school libraries in many LEAs across the state pursuant to the Per Se Ban, despite their literary merit and ability to help students navigate similar challenges and lived experiences.

55.     For each of the Author Plaintiffs, school libraries represent a critical avenue for reaching their intended young adult audience. The removal and banning of their books across Utah's LEAs and their libraries pursuant to the Per Se and Statewide Bans, along with the stigma associated with their published works being labeled as "pornographic" or "indecent" by legislative mandate, causes each Author Plaintiff personal harm, professional harm, and deprives their intended audiences of constitutionally protected literature specifically written to help young adults understand and navigate the world we live in.

### Student Plaintiffs[17]

56.     Plaintiffs Student Doe #1 and Student Doe #2 (the "**Student Plaintiffs**") are high school students at Utah public schools who wanted and intended to check out specific books from their school libraries that have been removed due to the Book Removal Law's Per Se and Statewide Bans. Student Plaintiffs want to access those books and others like them so that they can better understand their own and other peoples' lived experiences, access and receive information from diverse viewpoints, and learn to navigate the complexities of growing up in today's world.

---

[17] Pursuant to DUCivR 10-2, the Student Plaintiffs will jointly file a motion to proceed under pseudonym and sealed notice of intention to proceed under a pseudonym.

57.    The Student Plaintiffs bring these claims by and through their parents, Parent Doe #1 and Parent Doe #2.

58.    The Student Plaintiffs are among the thousands of young Utahns across the state who, due to the Book Removal Law, are denied access to books that could help them understand their own experiences and the experiences of those around them. The removal of these books also hinders their ability to prepare for the challenges they will face as adults. Both students are avid readers who had sought out specific books from their school libraries only to discover those books were removed under the Per Se and Statewide Bans.

59.    The need for such literature is urgent. According to Utah's own public health data, 14.8% of high school students in Utah reported experiencing sexual violence.[18] For these students, books that honestly address trauma, healing, and personal agency are not academic abstractions but essential resources for understanding and processing their experiences.

60.    Similarly, according to data from the National Institute on Drug Abuse from 2023, 10.9% of eighth graders, 19.8% of 10th graders, and 31.2% of 12th graders reported the use of an illicit drug in the prior year.[19] Teenage Utahns experiencing addiction themselves or in their families, rely on literature to know that they are not alone and that

---

[18] *Complete Health Indicator Rep. of Sexual Violence,* PUB. HEALTH INDICATOR BASED INFO. SYS. (IBIS) (2024), https://ibis.utah.gov/ibisph-view/indicator/complete_profile/Rape.html.

[19] *Reported drug use among adolescents continued to hold below pre-pandemic levels in 2023,* NAT'L INST. ON DRUG ABUSE (2023), https://nida.nih.gov/news-events/news-releases/2023/12/reported-drug-use-among-adolescents-continued-to-hold-below-pre-pandemic-levels-in-2023.

there is help out there. They may not have known of or even understood their situations but for the books on their school library shelves.

61.    Student Doe #1 ("**Doe #1**") is a senior at a Utah high school who dreams of becoming an emergency medical provider and is currently enrolled in emergency response and medical training.

62.    During her freshman year of high school, Doe #1 was the victim of a sexual assault. The list of books Doe #1 has read that talk about sexual assault is long, but each one gave her a new understanding of the pain, trauma, and walking the road to recovery that are essential parts to her own story.

63.    Doe #1 wants to read *What Girls are Made Of* because it would allow her to uniquely connect to the world around her; however, she is now robbed of perspectives and narratives that would allow Doe #1 to process and learn from her experiences rather than being unprepared to encounter these in adult life.

64.    As someone preparing for a career in emergency medical response and services, Doe #1 also recognizes that literature can help prepare her to understand and address harsh realities of the communities she hopes to serve. The Per Se and Statewide Bans deny Doe #1 access to books that explore these difficult but critically important topics, leaving her less prepared for both her personal healing and professional aspirations.

65.    Doe #1's parent wants her daughter to have access to these types of books for the same reasons.

66.    Student Doe #2 ("**Doe #2**") is a freshman at a Utah high school who enjoys reading, painting, poetry, dance, and volleyball. She aspires to become a lawyer and is committed to pursuing a career in public service.

67.    Doe #2 wanted to check out Ms. Hopkins' *Tilt* and Ms. Arnold's *What Girls Are Made Of* from her school library in the 2025-2026 school year; however, she was unable to access them because they were removed from her school's library pursuant to the Statewide Ban.

68.    Doe #2 sought out these books because they offer realistic portrayals of teenagers navigating the transition to adulthood, dealing with complex issues like identity, relationships, and the challenges young women face. As she explains, she wants access to literature that presents "diverse perspectives, viewpoints, and experiences" that will help her "deepen her understanding of different cultures, backgrounds, and identities and better prepare her to engage with and relate to a wide range of people"—exactly the kind of preparation that would serve her well in her chosen field of law and public service.

69.    Doe #2's parent wants her daughter to have access to these types of books for the same reason.

70.    The Student Plaintiffs also want to be able to access these books and others like them from school libraries without the stigma that comes with the state having labeled them "pornographic," "indecent," or "obscene." For them, school libraries serve as a fundamental resource for gaining new understanding and discovering perspectives not covered in their prescribed curriculum, which is the very purpose school libraries are meant to serve.

## B. **Defendants**

71.    Defendant Derek Brown is the Attorney General of Utah who is responsible for enforcing Utah's laws, including the Per Se Ban and Statewide Bans. He is sued in his official capacity as the state's chief legal officer.

72.    Defendant Utah State Board of Education (the "**USBE**") is the state government entity responsible for overseeing Utah's public education system, including the implementation and enforcement of the Book Removal Law in school libraries across the state.

73.    Defendants Amanda Bollinger, Randy Boothe, Joann Brinton, Christina Boggess, Cindy Bishop Davis, Jennie Earl, Emily Green, Rod Hall, Molly Hart, Matt Hymas, Cole Kelley, Joseph Kerry, Carol Barlow Lear, Sarah Reale, and Leann Wood are members of the Utah State Board of Education ("**Board Members**").

74.    Board Members are sued in their official capacity for their role in creating guidance that instructs local school districts on how to implement the Per Se and Statewide Bans, including requiring specific steps to dispose of banned books.

75.    This lawsuit also names as defendants several LEAs that have actively removed books under the Per Se Ban:

> a.    Defendant Davis School District's ("**Davis**") Board of Education is the seven-member elected governing body of Davis. Pursuant to Utah Code, Davis' Board of Education appoints a district superintendent who serves as Davis' Chief Executive Officer.
>
> b.    Defendants Brigit Gerrad, Emily Price, Alisa Mercer, Joani Stevens, Julie Powell, Michelle Barber, and Kristen Hogan compose Davis' board of education. They are sued in their official capacity.

c.  Defendant Dan Linford is the Superintendent of Davis. As Superintendent, Linford is Davis' chief executive officer and is responsible for the day-to-day administration of Davis and carrying out Board Policy, including the final administrative decision for Davis regarding whether a book is removed from school library shelves.

d.  Defendant Salt Lake City School District's ("**Salt Lake**") Board of Education is the eight-member elected governing body of Salt Lake. Pursuant to Utah Code, Salt Lake's Board of Education appoints a district superintendent who serves as Salt Lake's Chief Executive Officer.

e.  Defendants Bryce Williams, Charlotte Fife-Jepperson, Ashley Anderson, Nate Salazar, Annie Romano, Bryan Jensen, and Amanda Longwell compose Salt Lake's board of education. They are sued in their official capacity.

f.  Defendant Elizabeth Grant is the superintendent of Salt Lake. As superintendent, Grant is Salt Lake's chief executive officer and is responsible for the day-to-day administration of Salt Lake and carrying out Board Policy, including the final administrative decision for Salt Lake regarding whether a book is removed from school library shelves.

g.  Defendant Washington School District's ("**Washington**") Board of Education is the nine-member elected governing body of Washington. Pursuant to Utah Code, Washington's Board of Education appoints a district superintendent who serves as Washington's Chief Executive Officer.

h.  Defendants David Stirland, Larene Cox, Craig SeegMiller, Burke Staheli, Craig Hammer, Heidi Gunn, Ron Wade, Brent Bills, and Richard Holmes compose Washington's board of education. They are sued in their official capacity.

i.  Defendant Richard Holmes is the Superintendent of Washington. As Superintendent, Holmes is Washington's chief executive officer and is responsible for the day-to-day administration of Washington and carrying out Board Policy, including the final administrative decision for Washington regarding whether a book is removed from school library shelves.

76.  All Defendants are state actors operating under color of state law with respect to the book removals and enforcement actions challenged in this lawsuit. Whether

27

as state officials, state board members, or LEAs carrying out state-mandated policies, each Defendant wields government authority in implementing and enforcing the Book Removal Law containing the Per Se and Statewide Bans that strip books from school library shelves across Utah.

77.     The Fourteenth Amendment to the United States Constitution incorporates the protections of the First Amendment and makes them applicable to state and local government actors. All Defendants—from the Governor who signed the law to the LEAs removing books from their shelves—are therefore bound by the constitutional requirement to respect students' and authors' First Amendment rights to free speech and access to information and ideas.

## FACTUAL ALLEGATIONS

### A. School Libraries

78.     To understand what Utah has dismantled with its Per Se and Statewide Bans, it is essential to first understand what school libraries are meant to be and how they serve students across the state.

79.     School libraries are integral to student learning. They occupy a unique and vital role in education. In many cases, a school library is a student's only access to books, ideas, and experiences that can deeply impact their lives. This is especially true for students who cannot afford to buy their own books. Unlike classrooms where curriculum is prescribed and uniform, school libraries are places of self-directed learning where students can explore ideas, perspectives, and subjects that spark their individual curiosity or relate to them personally.

80.    As the Supreme Court recognized decades ago, the school library serves as "the principal locus" of students' freedom "to inquire, to study and to evaluate, to gain new maturity and understanding"—a place where young people can "explore the unknown" and "discover areas of interest and thought not covered by the prescribed curriculum." *Pico*, 457 U.S. at 868–69.

81.    For over a century, the ALA's mission has been "[e]mpowering and advocating for libraries and library workers to ensure equitable access to information for all."[20] ALA's Freedom to Read Statement maintains that "[i]t is in the public interest for publishers and librarians to make available the widest diversity of views and expressions, including those that are unorthodox, unpopular, or considered dangerous by the majority."[21]

82.    In its interpretation of the Library Bill of Rights, the ALA states "[s]tudents and educators served by the school library have access to resources and services free of constraints resulting from personal, partisan, or doctrinal disapproval. School librarians resist efforts by individuals or groups to define what is appropriate for all students or teachers to read, view, hear, or access regardless of technology, formats or method of delivery."[22]

---

[20] *Mission & Priorities,* AM. LIBR. ASS'N (2008), https://www.ala.org/aboutala/missionpriorities.

[21] *The Freedom to Read Statement*, AM. LIBR. ASS'N (2006), https://www.ala.org/advocacy/intfreedom/freedomreadstatement.

[22] *Access to Res. & Serv. in the Sch. Libr.: An Interpretation of the Libr. of the Bill of Rights*, AM. LIBR. ASS'N (2007) https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/accessresources.

83.    Utah recognizes the critical importance of robust school library programs and strives to implement them locally. Utah's Core Standards for Library Media explains that "[l]ibraries support independent readers by providing a variety of materials for informational and leisure reading. Reading extensively strengthens stamina and broadens students' global perspective."[23]

84.    Utah's Core Standards further explain that "[s]tudents need the lifelong skills of selecting information from a wide variety of sources, assessing its worth, and applying newfound knowledge to problems, preparing them for learning, doing, and problem solving in college, career, and throughout life." *Id.*

85.    The goal, as the USBE explained, is "to recognize individual students' interests and needs and provide materials in a variety of formats, genres, and languages, at varied reading levels." *Id.*

86.    This approach reflects Utah's historical commitment to intellectual freedom and open access to knowledge. The State understood that school libraries are vital resources for fostering informed and engaged citizens, free from undue censorship or suppression of diverse perspectives.

## B. Utah LEAs Had Systems In Place To Ensure That Obscene and Inappropriate Materials Were Not Available On Library Shelves Long Before the Book Removal Law

87.    Long before the Legislature interfered with the Book Removal Law, Utah

---

[23] UTAH STATE BD. OF EDUC., UTAH CORE STANDARDS: 6-12 LIBR. MEDIA (February 2015), https://schools.utah.gov/curr/librarymedia/lm_utahcorestandards/SecondaryCoreStandards%206-12.pdf.

LEAs and their libraries had in place informed, comprehensive systems that ensured the age-appropriate curation of library media collections while preserving intellectual freedom. These systems were carefully constructed by trained professional librarians and educators based on professional standards, community input, and constitutional principles. They were not born of neglect or indifference.

88.    LEAs maintained library selection policies based on national standards established by the ALA and the American Association of School Librarians. These standards provided clear guidance to educators, administrators, and librarians about selecting, screening, reconsidering, and when necessary, removing materials from school libraries. These systems recognized both the need for age-appropriate curation and the constitutional requirement that any restrictions be reasonable and educationally justified.

89.    Beyond professional standards, the system included practical safeguards. Utah schools purchased their library books from established, reputable publishers—companies that have built their reputations on providing quality educational and literary materials. None of these publishers produce or offer pornographic materials or content that would violate established constitutional standards for obscenity.

90.    These systems were not theoretical, they were actively functioning across LEAs. They entrusted the dedicated professionals and community members to build library collections that supported the diverse educational, developmental, cultural, social, and linguistic needs of students in their communities.

91.    Moreover, LEAs maintained library media policies and procedures governing the selection, placement, and removal of school library materials that predated the Book Removal Law.

92.    For example, Davis adopted their School Library Media Centers Policy and Procedures on September 17, 2013. *See* Exhibit B1, Davis' November 4, 2020, Library Media Policy, at Page 4, document history.

93.    As outlined in Davis' November 4, 2020, revisions to their Library Media Policy and Procedures, school library resources were selected by the library professional at each school site using the guidelines and criteria Davis developed under the direction of the District Supervisor and approved by the Assistant Superintendent over Teaching and Learning. *Id.* at § 2.1.1. That policy provided that "the school's professional library staff should periodically review the collection to determine which materials should be removed or replaced." *Id.* at § 2.2.1. Each school's library professional was also "responsible to maintain a regular inventory of library materials and equipment. A formal inventory shall be conducted annually to assess the library collection and help with the selection and acquisition of materials and equipment." *Id.* at § 2.4.

94.    Davis' policy also recognized the rights of parents to restrict their own child's access to materials the parent deems inappropriate under state law and in accordance with Davis Policy 11R-107, Recognizing Constitutional Freedoms in Public Schools. *Id.* at § 3. To restrict their own child's access to any specific book or material, a parent need only submit the request in writing to the library professional at the school the

child is attending. *Id.* "However, no parent has the right to make that decision on behalf of other students." *Id.*

95.    Beyond their own child, any parent wishing to challenge the placement of a book in a school's library media center as a whole could do so through the process outlined in Davis' Library Media Policy and Procedures. *Id.* at § 4. To trigger a review of any book contained in Davis' Library catalog, a parent need only submit a School Level Challenge of Library Media Materials Form. *Id.* Upon receipt of this form, the library professional would notify Davis' District Supervisor and call a meeting of the Collection Evaluation Committee ("**Evaluation Committee**") to introduce the request. *Id.* at § 4.1.2. After affording all parties the time to review the materials and argue their views, the Evaluation Committee would deliberate and reach a decision to either retain the material, relocate the material, or remove the material. *Id.* at § 4.1.4–4.16.

96.    If the parent was unsatisfied with the decision of the Evaluation Committee, they could avail themselves to the appeals process before the District Appeal Committee. *Id.* at § 4.2.

97.    Similarly, Washington adopted their Review of Instructional Media Policy on April 9, 1991. *See* Exhibit B2, Washington's November 11, 2019, Review of Instructional Media Policy.

98.    As outlined in Washington's November 11, 2019 revisions to their Review of Instructional Media Policy, Washington maintained comprehensive policies and procedures governing the selection, placement, and removal of school library materials that preexisted the Book Removal Law. *See id.*

99.    Likewise, Salt Lake had policies and procedures in place to ensure appropriate access, content, and distribution of school media and library books that preexisted the Book Removal Law. *See* Exhibit B3, Salt Lake City School District Board Minutes, April 9, 2019, Listing Board Policy I-21: School Media and Publications.

100.    The robustness of these existing systems was made clear during legislative hearings on the proposed book removal law on October 19, 2022, when Cindy Davis, a Deputy Superintendent from the USBE, testified before the Education Interim Committee that the State already required every LEA in Utah to create and publish their criteria and procedures for selecting books for their library shelves.[24]

101.    More importantly, as Ms. Davis explained, prior to the creation of the Per Se and Statewide Bans, LEAs were already required to maintain processes allowing students, parents, and staff to submit removal requests for any book or material they believed inappropriate. *Id.*

102.    This existing framework addressed the very concerns that the Per Se and Statewide Bans proponents claimed necessitated their law. They argued that the legislation was needed so parents could protect their children and control what they were reading, but there was not a single LEA in Utah that failed to provide parents and guardians with meaningful input into their child's learning and access to library materials.

---

[24] *Educ. Interim Comm.*, Utah Legislative Session 13:00-17:00 (October 19, 2022) (statement of Cindy Davis, then Second Vice-Chair of the USBE), available at https://le.utah.gov/av/videoClipTest.jsp?meetingType=committee&stream=https://stream1.utleg.gov/vodvideo/smil:rC445_V19_101922_02.smil/playlist.m3u8&offset=5006.

103.    In essence, Utah developed a multi-layered system of professional expertise, LEA regulation, community input, parental involvement, and publisher accountability that operated within established constitutional boundaries.

### C. Statutory Framework and Background

104.    The constitutional shortcomings of the Book Removal Law set forth above were not created in a vacuum. They result from specific statutory language and enforcement mechanisms that Utah's legislature intentionally put in place. To understand how the Per Se and Statewide Bans operate in practice and why their constitutional flaws are so pervasive, it is necessary to examine the law's structure and the way school districts have implemented it across the state (i.e., the only way it may be implemented, based on the law's plain language).

105.    The story of Utah's Per Se and Statewide Bans begins not with any documented crisis in school libraries, but with a political decision to manufacture one.

### The First Iteration of the Book Removal Law

106.    In 2022, the Utah Legislature first enacted the Book Removal Law via House Bill 374 ("**HB 374**"). Codified at Utah Code § 53G-10-103, HB 374 prohibited "sensitive materials" in the school setting and declared, by legislative fiat, that any material deemed "sensitive" is automatically pornographic or indecent material. UTAH CODE ANN. § 53G-10-103(g)(i) (2022).

107.    HB 374 incorporated three criminal-code sections to define "sensitive material": (i) material deemed "harmful to minors" under Section 76-10-1201; (ii) material classified as "pornographic" in 76-10-1203; or (iii) material identified in Section

76-10-1227. UTAH CODE ANN. § 76-10-1235(a) (2022).

108.    The first definition, "*Harmful to minors*," covers any description or representation of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse when: "(i) taken as a whole, appeals to the prurient interest in sex of minors; (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and (iii) taken as a whole, does not have serious value for minors." UTAH CODE ANN. § 76-10-1201 (2022).

109.    This definition complies with the requirements of the *Miller*-for-minors standard.

110.    The second definition, "*Pornographic material or performance*" classifies as "pornographic" any material that "(a) the average person, applying contemporary community standards, finds that, taken as a whole, it appeals to the prurient interest in sex; (b) it is patently offensive in the description or depiction of nudity, sexual conduct, sexual excitement, sadomasochistic abuse, or excretion; and (c) taken as a whole it does not have serious literary, artistic, political or scientific value." UTAH CODE ANN. § 76-10-1203 (2022).

111.    This definition also complies with requirements of the *Miller*-for-minors standard.

112.    But the third definition deliberately disregards First Amendment jurisprudence.

113.    Currently codified at Utah Criminal Code § 76-5c-207(1)(a)(i)(A) and titled "Indecent public displays," it defines prohibited content as "(i) human genitals in a state

of sexual stimulation or arousal; (ii) acts of human masturbation, sexual intercourse, or sodomy; (iii) fondling or other erotic touching of human genitals or pubic region; or (iv) fondling or other erotic touching of the human buttock or female breast." UTAH CODE ANN. § 76-5c-207(1)(a)(i)(A).

114.    This definition purports to follow the *Miller*-for-minors standard by stating that it "does not apply to any material which, when taken as a whole, has serious value for minors." UTAH CODE ANN. § 76-5c-207(5).

115.    However, it immediately negates that protection by declaring as a bright-line rule that "a description or depiction of illicit sex or sexual immorality has no serious value for minors." UTAH CODE ANN. § 76-5c-207(5).

116.    In other words, the statute gives with one hand what it takes away with the other: it claims to require consideration of a work's value as a whole, then categorically declares that any work containing the prohibited descriptions has no value, and prohibits any actual consideration of the work as the First Amendment requires.

117.    This definition does ***not*** comply with requirements of the *Miller*-for-minors standard and is what this Complaint refers to as the Per Se Ban.

118.    By applying this criminal definition to books in school libraries, the prior version of the Book Removal Law created a non-discretionary, categorical mandate that any book containing these descriptions must be removed from school libraries and deemed, as a matter of law, to have no value for minors regardless of the student's age or the book's merit as a whole.

119.    That said, until the Book Removal Law was amended by House Bill 29, LEAs—at least in theory—had the ability to consider the value of a book as a whole as required by the *Miller*-for-minors standard. As explained below, that is no longer the case.

### Guidance From Utah's Attorney General

120.    Following the 2022 enactment of the Book Removal Law, the Utah Attorney General's Office (the "**AGO**") issued two guidance memoranda to help LEAs navigate the Book Removal Law's sweeping mandate and the constitutional tensions the Legislature created. These memos revealed the fundamental conflict between the Per Se Ban and the requirements of the First Amendment.

121.    The AGO's first guidance memorandum (the "**First Guidance Memo**"), issued May 4, 2022, emphasized that "[t]he United States Supreme Court has an extremely long history of recognizing that students have their own First Amendment rights in school. The removal of books from a school library can constitute an official suppression of ideas, in violation of the First Amendment[,]" and "the special characteristics of the school library make that environment especially appropriate for the recognition of such rights." *See* Exhibit C1, First Guidance Memo, at 1–2.

122.    The First Guidance Memo explained that "it is important to note that, to be defined as harmful to minors, a book must meet all three factors[,]" including consideration of a work's value as a whole. *Id*. at 2.

123.    But when addressing the third incorporated definition—the source of the Per Se Ban—the First Guidance Memo noted the constitutional problem without resolving it.

124.    The First Guidance Memo acknowledged that Utah Code Section 76-10-1227(2)(c) "provides that 'a description or depiction of illicit sex or sexual immorality as defined in Subsection (1)(a)(i), (ii), or (iii) has no serious value for minors,'"[25] but attempted to reconcile this with constitutional requirements by emphasizing that "the book must be considered in its entirety when determining whether it has scientific, literary, artistic, or political value." *Id.* at 4–5.

125.    The First Guidance Memo makes clear that the "three-prong test under 76-10-1201(5)(a) must always be used when assessing whether a library book is 'sensitive material.'"[26] *Id.* at 6.

126.    Less than a month later, on June 1, 2022, the AGO issued a second guidance memo ("**Second Guidance Memo**") that superseded any previous guidance. *See* Exhibit C2, Second Guidance Memo at 1.

127.    The Second Guidance Memo acknowledged that the Book Removal Law "creates a new legislative approach to identify 'sensitive materials' in a school setting under Utah statute." *Id.* at 4. The Second Guidance Memo then reverses course, stating "under HB 374, pornographic or indecent material means any materials defined as harmful to minors in Utah Code Section 76-10-1202, described as pornographic in Section 76-10-1203, or described in Utah Code Section 76-10-1227. Under HB 374, if a school

---

[25]  The First Guidance Memo refers to the 2022 codification of "a description or depiction of illicit sex or sexual immorality." As currently enacted, "a description or depiction of illicit sex or sexual immorality," is codified at Utah Code § 76-5c-207(1)(a)(i)(A), (B), & (C).

[26]  The First Guidance Memo refers to the 2022 codification of the "three-prong" *Miller*-for-minors test. As currently enacted, the "three-prong" *Miller*-for-minors test is codified at Utah Code § 76-5c-101(7)(a).

library book meets the definition of any of these three standards, then the book should be removed from a school library." *Id.* at 4.

128.    The Second Guidance Memo goes on to say that "Section 76-10-1227(2)(c) can be read as a legislative directive that no description of illicit sex in subsections (i-iii) could have any serious literary, artistic, political, or scientific value[,]" and that "[s]uch an interpretation creates categorical exclusions or a 'bright line' rule." *Id.* at 5.

129.    Notably, the Second Guidance Memo warned that "even when removal of library books meets strict compliance with HB 374 and related state statutes, a legal challenge will invite application of federal First Amendment jurisprudence, a body of cases which have not favored bright line rules in obscenity cases." *Id.* at 5. The Second Guidance Memo also cautioned that "failure to consider library materials 'as a whole' may present risk of conflict with federal law." *Id.* at 6.

### The 2024 HB 29 Amendments to the Book Removal Law

130.    Rather than remedy the Book Removal Law's deviations from the requirements of the First Amendment, in 2024 the Utah Legislature codified the Per Se Ban's non-discretionary, categorical prohibition and expanded the Per Se Ban's reach across the state through House Bill 29 ("**HB 29**").

131.    While the Per Se Ban was created by the 2022 version of the Book Removal Law, HB 29 clarified the Per Se Ban's categorical, non-discretionary prohibition through its definition of "objective sensitive material." As currently enacted in HB 29, "'objective sensitive material' means an instructional material that constitutes pornographic or indecent material, as that term is defined in Section 76-5c-208, under the non-

discretionary standards described in Subsections 76-5c-207(1)(a)(i)(A), (B), or (C)." UTAH
CODE ANN. § 53G-10-103(1)(e).

132.    The amendment clarified the Legislature's intent that libraries and those
enforcing the Book Removal Law have no discretion to continue to offer books that violate
the Per Se Ban's objective mandate—even if the book satisfies the *Miller*-for-minors
standard—and that LEAs are prohibited from even considering the value of a book as a
whole if it runs afoul of the Per Se Ban.

133.    Worse yet, HB 29 added the Statewide Ban, which requires every LEA in
Utah to automatically remove from every school library in Utah any book classified as
"objective sensitive material" by three or more LEAs or two LEAs and five or more charter
schools, regardless of whether the other LEAs around the state received any complaints
about the book or wanted to retain it.

134.    The HB 29 amendment also established an expedited removal process:
upon receiving an allegation that material contains sensitive content and determining
that the complaint is merely "plausible," LEAs must "immediately remove the challenged
material from any school setting that provides student access" while conducting their
review. Utah Code ANN. § 53G-10-103(4)(a)(ii). Crucially, LEAs must first apply the Per Se
Ban before considering whether material might qualify as merely "subjective sensitive
material."

135.    HB 29 also added a directive that in "evaluating, selecting, or otherwise
considering action related to a given instructional material," each school and LEA "shall

prioritize protecting children from the harmful effects of illicit pornography over other considerations in evaluating instructional material." Utah Code Ann. § 53G-10-103(2)(c).

### D. The Per Se and Statewide Bans in Practice

136.    The constitutional violations described have produced concrete harm across Utah's school system. The story of how the Book Removal Law operates reveals both the breadth of its impact and the arbitrary nature of its enforcement.

### Application Statewide

137.    After the passage of HB 29, to effectuate the Book Removal Law's Statewide Ban, the USBE created a running list of every book deemed "objective sensitive material" under the Per Se Ban by any LEA in Utah to ensure the statewide removal of any book triggering the Statewide Ban's three-or-more LEA threshold. As of the filing of this Complaint, 22 titles have been banned and removed from every public school library in Utah pursuant to the Statewide Ban.

138.    According to public records, between July 2024 and December 2024, Utah LEAs reported 163 books as sensitive material to the USBE pursuant to the Per Se Ban. Of those 163 reports, Davis submitted 77 reports (47%), and Washington submitted 51 reports (31%), together accounting for 78% of all reports.[27] These two LEAs, Davis and

---

[27] Martha Harris, *With Utah's statewide book bans, 2 sch. dists. have steered the conversation,* KUER (Dec. 6, 2024, at 2:00 MST), https://www.kuer.org/education/2024-12-06/with-utahs-statewide-book-bans-2-school-districts-have-steered-the-conversation; *see also Books Banned under "Bright Line" law in Utah (based on public reporting)*, https://docs.google.com/spreadsheets/d/1kNS5SkCCmT3A_aefgq6k_DdsX_suCkLrBYWi0Ju8Bcw/edit?gid=900113889#gid=900113889 (last visited on Dec. 17, 2025).

Washington, contributed to the removal of all 22 titles currently on the Statewide Ban List.[28]

139.    The Statewide Ban List includes five books authored by the Author Plaintiffs, including Elana K. Arnold's *What Girls Are Made Of* and *Damsel*, and Ellen Hopkins' *Tilt*, *Fallout*, and *Tricks*.

140.    None of the books authored by the Author Plaintiffs, including those on the Statewide Ban List, constitute pornography or obscenity.

141.    The Per Se and Statewide Bans resulted in the removal of those 22 books from every public school library in Utah, including those authored by the Author Plaintiffs, absent any consideration of the value of those books as a whole or for their literary, scientific, medical, artistic, or political value and, at the same time, ignored the age of the individual readers.

142.    The USBE also stigmatizes the books on the Statewide Ban List, as well as the authors and readers of those books, by falsely branding them as pornographic or indecent material.

143.    As a result, students in Utah's schools are impaired from being exposed to diverse experiences and viewpoints that are integral to a student's well-rounded education or critical to navigating their own lives.

---

[28] *Sensitive Materials Removed in a Pub. Sch. Setting Statewide,* UTAH STATE BD. OF EDUC., https://usbe-my.sharepoint.com/:x:/g/personal/davina_sauthoff_schools_utah_gov/EbrZ_-SSE5RMqDxBhGxrmCUB_U3991VFqWry09cvgWRBZg?e=57gOQc (last visited Jan. 5, 2025).

144.    But the Statewide Ban list tells only part of the story. Individual LEAs have unlawfully removed hundreds of additional titles, creating a confusing patchwork where students' access to literature depends entirely on which LEA they live in.

### Individual LEAs

145.    **Davis School District:** According to its website, Davis has banned and removed approximately 91 books from their library shelves based on a determination that those books constituted objective sensitive materials under the Per Se Ban's non-discretionary mandate.[29]

146.    The list of removed books includes 14 books written by Plaintiffs, including Kurt Vonnegut's *Slaughterhouse-Five*; Dr. Angelou's *I Know Why the Caged Bird Sings,* Ellen Hopkins' *Tilt, Tricks, Collateral, Fallout, Glass, People Kill People, Perfect* and *Rumble;* and Elana K. Arnold's *What Girls Are Made Of, Damsel, Infandous,* and *Red Hood.*

147.    Pursuant to the Book Removal Law, Davis's Specialized Review Committee determined that *I Know Why the Caged Bird Sings* contained sensitive material as defined by the Per Se Ban and thus constitutes pornographic or indecent material under the Book Removal Law. As Davis's Specialized Review Committee explains "[t]herefore,

---

[29]    *Sensitive Instructional Materials Policies & Proc.*, DAVIS SCH. DIST. (2025), https://www.davis.k12.ut.us/page/sensitive-materials-review.

according to Utah Law, the book has no serious value for minors, and it has been removed from school library circulation."[30]

148.    Davis has also removed timeless classics under the Per Se Ban including John Green's *Looking for Alaska*.

149.    John Green's *Looking for Alaska* is a coming-of-age school story and teen romance about a boarding school student who is bullied. The *New York Times* bestselling novel won the ALA's Michael L. Printz Award and was a finalist for the *Los Angeles Times* Book Prize. *Looking for Alaska* was featured on the ALA's Top Ten Best Book for Young Adults, the YALSA's Teen's Top Ten Award, and the ALA's Quick Pick for Reluctant Young Adult Readers. It has been named a New York Public Library Book for the Teen Age, a Booklist Editor's Choice Pick, and a Borders Original Voices Selection.

150.    In accordance with the requirements of the Per Se Ban, Davis removed those 77 books, including the Plaintiffs' books, and labeled them as pornographic or indecent material, absent any consideration of their value as a whole or for their literary, scientific, medical, artistic, or political value and, at the same time, ignored the age of the individual readers.

151.    Davis' removal and labeling of those books, including the Author Plaintiffs' books like Dr. Angelou's *I Know Why the Caged Bird Sings*, unfairly stigmatizes the

---

[30] *Id.; see I know why the Caged Bird Sings – Maya Angelou: Initial Decision Rationale,* SENSITIVE MATERIALS REV. REQUESTS - DETAILS ("The Specialized Review Committee determined that the book contains sensitive material defined in Utah Code § 76-10-1227(1)(a)(i), (ii), or (iii). Therefore, according to Utah Law, the book has no serious value for minors, and it has been removed from school library circulation.")

books, as well as their authors and readers, and falsely brands them as obscene or pornographic materials.

152.    Davis' removal of those books under the Per Se Ban's non-discretionary mandate also deprives students in Davis and around the state from being exposed to diverse experiences and viewpoints that are integral to a student's well-rounded education or personal development.

153.    **Washington School District:** According to Washington's website, it has banned and removed approximately 57 books pursuant to the Per Se Ban.[31]

154.    The titles removed by Washington under the Per Se Ban include 14 titles authored by Plaintiffs, including Kurt Vonnegut's *Slaughterhouse-Five*; Amy Reed's *Beautiful;* Elana K. Arnold's *What Girls Are Made Of, Damsel, Infandous,* and *Red Hood;* and Ellen Hopkins' *Tilt, Triangles, Tricks, Fallout, Identical, Glass, People Kill People, Perfect, and Rumble.*

155.    Washington has also removed timeless classics under the Per Se Ban, including Erin Gruwell's *The Freedom Writers.*

156.    Erin Gruwell's *The Freedom Writers* received widespread literary acclaim for its raw, authentic portrayal of students overcoming adversity through the power of writing and education. The book—a compilation of real student diaries—has been praised for its emotional depth and its ability to give voice to marginalized youth. Critics and educators alike have recognized it as a powerful teaching tool that inspires empathy,

---

[31] *Materials Removed Due to Bright-Line Violations*, WASHINGTON CNTY. SCH. DIST. (2025), https://www.washk12.org/library-media/material-status/.

resilience, and social awareness. A New York Times Bestseller, *The Freedom Writers* is widely recognized for its value in the fields of education and social justice, and went on to inspire the 2007 film *Freedom Writers,* which received numerous humanitarian and audience distinctions and awards.

157.    Pursuant to the Per Se Ban, Washington removed those books, including the Author Plaintiffs' books, and labeled them as pornographic or indecent material, absent any consideration of the value of those books as a whole or for their literary, scientific, medical, artistic, or political value and, at the same time, ignored the age of the individual readers.

158.    Washington's removal and unjust labeling of those books stigmatizes them, as well as their authors and readers, by falsely branding those books as pornographic or obscene.

159.    Washington's removal of those books under the Per Se Ban's non-discretionary mandate also impairs Washington's students from being exposed to diverse experiences and viewpoints that are integral to a student's well-rounded education or personal development.

160.    **Salt Lake School District:** Salt Lake has banned and removed 22 books from their library, absent any consideration of the value of those books or the age of individual readers, pursuant to the Statewide and Per Se Bans' non-discretionary mandate.

161.    **Granite School District:** According to Granite School District's website, approximately 106 books have been banned and removed pursuant to the Per Se Ban.[32]

162.    Granite is of special concern because their policy dictates that, when a book is challenged as sensitive material, that book is immediately removed from library shelves until the challenge is resolved.[33] The result is that a range of published works have been removed indefinitely pending their review, and some reviews have been "in progress" as far back as 2022, acting as a de facto ban.

163.    The titles removed by Granite include 15 titles authored by plaintiffs, including Kurt Vonnegut's *Slaughterhouse-Five*; Dr. Angelou's *I Know Why the Caged Bird Sings*; Amy Reed's *Beautiful* and *The Nowhere Girls;* Ellen Hopkins' *Tilt, Triangles, Tricks, Crank, Fallout, People Kill People,* and *Perfect;* and Elana K. Arnold's *What Girls Are Made Of, Damsel, Infandous,* and *Red Hood.*

164.    Granite has also removed timeless classics under the Per Se Ban, including Khaled Hosseini's *The Kite Runner* and Toni Morrison's *The Bluest Eye*.

165.    *The Kite Runner*, published in 2003, tells the story of Amir, a young boy from Kabul, in the backdrop of turbulent events, from the fall of Afghanistan's monarchy through the Soviet invasion, the exodus of refugees to Pakistan and the United States, and

---

[32] *Libr. Book Rev. Tracker,* GRANITE SCH. DIST. (2025), https://docs.google.com/spreadsheets/d/e/2PACX-1vS6aiUybYmYhuJXiCCbRsm1G28Io8btn7dP1XQPAjXokBiyCcR_QwDV4ikdkc0-Iqk7Z_I5nuq0s20Q/pubhtml.

[33] *Granite Dist. Libr. Materials Selection, Reconsideration, & Deselection Guidelines,* GRANITE SCH. DIST. (2025), https://docs.google.com/document/d/e/2PACX-1vRa03E51oDAgaOrgA5bWAAJhe2n4rqk30jfOQ-Mke00R7il8N5E0r6q_3MmCKgAwXLXQLUpf1Sawleb/pub.

the rise of the Taliban regime. This *New York Times* bestseller explores themes of friendship, betrayal, guilt, redemption, and father-son relationships. The novel won the South African Boeke Prize, was twice voted Reading Group Book of the Year, and has been adapted into a motion picture and play. *The Kite Runner* was pulled from Granite's library shelves on October 6, 2022. As of the filing of this Complaint, Granite's review of *The Kite Runner* remains in process.

166.    In Toni Morrison's *The Bluest Eye,* an 11-year old black girl, in an America whose love for its blond, blue-eyed children can devastate all others, prays for her eyes to turn blue so that she will be beautiful, so that people will look at her, so that her world will be different. Published in 1970, *The Bluest Eye* contributed to Morrison receiving the Nobel Prize in Literature in 1993, is frequently included in high school curricula as a cornerstone text on race, beauty standards, and identity, and was selected as one of the top 100 novels of the 20th Century by Modern Library.

167.    Pursuant to the Per Se Ban's non-discretionary mandate, Granite removed those books, including the Author Plaintiffs' books, and labeled those books as pornographic or indecent material absent any consideration of the value of those books as a whole or for their literary, scientific, medical, artistic, or political-value and, at the same time, ignored the age of the individual readers.

168.    Granite's removal and labeling of those books, including the Author Plaintiffs' books, unfairly stigmatizes those books, as well as the authors and readers of those books, falsely branding them as obscene or pornographic materials.

169.    Granite's removal of books under the Per Se Ban's non-discretionary mandate deprives students in those LEAs from being exposed to diverse experiences and viewpoints that are integral to a student's well-rounded education or personal development.

170.    Presumably, because Granite's review of many of those books is still "in process," many of the books removed by Granite have not yet been officially designated as Objective Sensitive Material by Granite or the USBE. For example, Dr. Angelou's *I Know Why the Caged Bird Sings* was pulled from every school library in Granite pursuant to the Per Se Ban on April 8, 2024, yet, according to Granite's records, Granite's review of *I Know Why the Caged Bird Sings* is still "in progress."[34] Because of this, the books removed by Granite under the Per Se Ban have not yet been applied towards the three-or-more LEA or two LEA and five-or-more charter school threshold that triggers statewide removal.

171.    Were that to happen, or more likely, *when* that happens, it will be "strike-three" under the Per Se Ban for dozens of books, including classics like *The Kite Runner* and *Slaughterhouse-Five*, and those books will be ordered removed from every public school library in the State.

---

[34]    *Libr. Book Rev. Tracker,* GRANITE SCH. DIST. https://docs.google.com/spreadsheets/d/e/2PACX-1vS6aiUybYmYhuJXiCCbRsm1G28Io8btn7dP1XQPAjXokBiyCcR_QwDV4ikdkc0-Iqk7Z_I5nuq0s20Q/pubhtml (last visited Feb. 5, 2026).

172.   **Other LEAs:** In addition to the swaths of books removed by Davis, Washington, and Granite, other LEAs in Utah have removed dozens of books from their school libraries pursuant to the Per Se Ban's non-discretionary mandate.

173.   Alpine has removed approximately 39 titles from their school libraries based on a determination that those books constitute objective sensitive materials under the Per Se Ban's non-discretionary mandate.[35]

174.   Canyons has removed approximately 32 titles from their school libraries based on a determination that those books constituted objective sensitive materials under the Per Se Ban's non-discretionary mandate. *Id.*

175.   Nebo has removed approximately 17 titles from their school libraries based on a determination that those books constitute objective sensitive materials under the Per Se Ban's non-discretionary. *Id.*

176.   Jordan has removed approximately 10 titles from their school libraries based on a determination that those books constitute objective sensitive materials under the Per Se Ban's non-discretionary mandate. *Id.*

177.   The titles removed by Alpine, Canyons, Nebo, and Jordan under the Per Se Ban include 12 books authored by the Author Plaintiffs, including Amy Reed's *The Nowhere Girls*; Ellen Hopkins' *Tilt, Impulse, Fallout,* and *People Kill People;* and Elana K. Arnold's *What Girls Are Made Of,* and *Damsel.*

---

[35]  *Books Banned under "Bright Line" law in Utah (based on public reporting),* https://docs.google.com/spreadsheets/d/1kNS5SkCCmT3A_aefgq6k_DdsX_suCkLrBY Wi0Ju8Bcw/edit?gid=900113889#gid=900113889 (last visited on Dec. 17, 2025).

178.    The titles removed by Alpine, Canyons, Nebo, and Jordan under the Per Se Ban also include timeless classics such as Sara Gruen's *Water for Elephants* and Stephen Chbosky's *The Perks of Being a Wallflower.*

179.    Sara Gruen's *Water for Elephants*, which was adapted to film in 2011 and a Broadway musical in 2024, tells a story of a love between two people that overcome incredible odds in a world in which even love is a luxury that few can afford. An atmospheric, gritty, and compelling novel of star-crossed lovers, the New York Times Best Seller has earned numerous distinctions including a 2006 Quill Award nominee for general fiction, 2007 ALA Alex Awards selection, and winner of the 2007 BookBrowse award for most popular book.

180.    Stephen Chbosky's *The Perks of Being a Wallflower* is a deeply affecting coming-of-age story that follows a shy, introspective, and intelligent beyond-his-years yet socially awkward freshman in high school, caught between trying to live his life and trying to run from it. A #1 New York Times Best Seller, *The Perks of Being a Wallflower* has received international acclaim, earning distinctions such as placing #16 on NPR's the "100 Best-Ever Teen Novels" and a feature film adaptation.

181.    As required by the Per Se Ban, Alpine, Canyons, Nebo, and Jordan removed those books, including those authored by the Author Plaintiffs, and labeled them as pornographic or indecent material, absent any consideration of the value of those books as a whole or for their literary, scientific, medical, artistic, or political value and, at the same time, ignored the age of the individual readers.

182.    Alpine, Canyons, Nebo, and Jordan's removal and labeling of those books, including the Author Plaintiffs' books, unfairly stigmatizes those books, as well as the associated authors and readers, falsely branding them as obscene or pornographic materials.

183.    Alpine, Canyons, Nebo, and Jordan's removal of books under the Per Se Ban's non-discretionary mandate deprives students in those LEAs and students around the State from being exposed to diverse experiences and viewpoints that are integral to a student's well-rounded education or personal development.

184.    The mechanical operation of Utah's Per Se and Statewide Bans demonstrates their constitutional flaws. Books are banned not because they meet established legal standards for obscenity (in accordance with the *Miller*-for-minors standard), but because they contain descriptions that fall within the Per Se Ban's overbroad, content-based categorical prohibitions.

185.    The law never considers the reader. Once a single passage triggers the Per Se Ban, the book is removed from every shelf in the district (and once the Statewide Ban is triggered, from every shelf across the state), without any consideration of whether older students might benefit from engaging with challenging but age-appropriate material.

186.    Under the Per Se and Statewide Bans, literary merit, educational value, and age-appropriateness for different student populations are all irrelevant once a single passage triggers the automatic removal process.

187.    Worse yet, Utah students and authors can expect to see more books banned and removed, both statewide and in individual LEAs, after state auditors reviewed 22 high

school titles flagged by one member of a Utah parents' rights group and "found notable amounts of sexual content."[36] The 37-page report comes after the state lawmakers who sponsored the Book Removal Law asked auditors to identify school library books that have not faced formal removal challenges, according to the audit, and the auditors called for "more robust oversight" of materials entering public schools. The audit included schools in Salt Lake City School District, which, according to the district's website, has removed all 22 books pursuant to the Statewide Ban but removed no books pursuant to the Per Se Ban.[37]

## **LEGAL BACKGROUND**

188.    The Per Se Ban operates against well-established constitutional principles that protect both students' right to read and authors' right to reach their audience. Understanding these principles reveals why Utah's categorical prohibition violates the First Amendment.

### **Students Do Not Lose Their Rights at the Schoolhouse Door**

189.    The Supreme Court settled this question decades ago: students retain their constitutional rights in school. As the Court recognized, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American

---

[36] Carmen Nesbitt, *Utah book bans may not go far enough, state audit finds, citing 'notable amounts' of 'sexual content' still in schools*, THE SALT LAKE TRIBUNE (Oct. 14, 2025 at 16:25 MST), https://www.sltrib.com/news/education/2025/10/14/utah-book-bans-may-not-go-far/.

[37] *Sensitive Materials Removed in a Pub. Sch. Setting Statewide,* UTAH STATE BD. OF EDUC., https://usbe-my.sharepoint.com/:x:/g/personal/davina_sauthoff_schools_utah_gov/EbrZ_-SSE5RMqDxBhGxrmCUB_U3991VFqWry09cvgWRBZg?e=57gOQc (last visited Jan. 5, 2025).

schools," which serve as a "marketplace of ideas." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969).

190.    States and local school boards therefore "must discharge their important, delicate, and highly discretionary functions within the limits and constraints of the First Amendment." *Pico*, 457 U.S. at 867–68 (plurality opinion).

191.    The First Amendment also ensures that authors can communicate their ideas to students without undue interference by the government. "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them. In most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975).

### Students Have a Right to Read and Receive Ideas

192.    Students have the right not only to speak, but also to learn, read, and access information, and the government may limit that right only in very narrow circumstances.

193.    "The right of freedom of speech . . . includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read and freedom of thought . . . ." *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965). "[T]he State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." *Id.* at 482–83.

194.    When it comes to children, it is well established that "minors are entitled to a significant measure of First Amendment protection" that the government may restrict

"only in relatively narrow and well-defined circumstances." *Erznoznik,* 422 U.S. at 212–13.

## School Libraries Are Forums for Ideas

195.    In the setting of a public school library, the First Amendment "protects the right to receive information and ideas." *Pico,* 457 U.S. at 867–68 (plurality opinion).

196.    Courts agree that the government cannot require the content-based removal of library books to impose orthodoxy or to rid school libraries of messages with which they disagree. *See Pico,* 457 U.S. at 871; *see also Minarcini v. Strongsville City Sch. Dist.,* 541 F.2d 577, 580 (6th Cir. 1976); *Counts v. Cedarville Sch. Dist.,* 295 F. Supp. 2d 996, 1004–1005 (W.D. Ark. 2003) (quoting *Pico,* 457 U.S. at 871–872).

197.    Critical to the purpose of school libraries is the lack of "any kind of authoritative selection" of ideas by the State. *See Keyishian v. Bd. of Regents of Univ. of State of N.Y.,* 385 U.S. 589, 603–604 (1967).

198.    When the government restricts speech on government property, courts assess those restrictions based on the nature of the forum and the type of speech that is restricted. *See, e.g., Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 800 (1985).

199.    When courts evaluate the removal of school library books, they apply standards consistent with those governing restrictions in nonpublic forums. *Gibson,* 2025 WL 2408178, at *13.

200.    Within nonpublic forums, content-based restrictions must be (1) reasonable in light of the purpose of the forum and (2) viewpoint-neutral. *See, e.g.,*

Cornelius, 473 U.S. at 800; *accord Mansky*, 585 U.S. at 12, 16 (holding that the state must "articulate some sensible basis for distinguishing what [speech is allowed] from what [speech is not allowed]"); *Burnham v. Ianni*, 119 F.3d 668, 676 (8th Cir. 1997) (holding that "the suppression of exactly [the] type of information" the forum was created for "was simply not reasonable").

201.    Thus, the Per Se and Statewide Bans are constitutional only if their content-based restrictions on library books are reasonable in light of the purpose served by school libraries.

**Obscenity Standards Are Narrow for Minors**

202.    While the State has a legitimate interest in prohibiting students from accessing books that are obscene for minors, a book is not obscene for older minors merely because it contains a description of a sex act.

203.    Obscenity is limited to works that (a) "taken as a whole, appeal to the prurient interest in sex"; (b) "portray sexual conduct in a patently offensive way"; and (c) "taken as a whole, do not have serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24.

204.    When applied to minors, the *Miller* obscenity standard must account for the age of the reader. *See Erznoznik*, 422 U.S. at 213–14 n.11 ("[T]he age of a minor is a significant factor."); *see also Virginia v. Am. Booksellers Ass'n Inc.*, 484 U.S. 383, 394-95 (1988); *Am. Booksellers Ass'n Inc. v. Com. of Va.*, 882 F.2d 125, 127-28 (4th Cir. 1989), *cert. denied,* 494 U.S. 1056 (1990); *Shipley Inc. v. Long,* 454 F. Supp. 2d 819, 829-30 (E.D. Ark. 2004) (holding that the State cannot "effectively stifle [] the access" of "older

minors to communications and material they are entitled to receive and view" just because such material may be "harmful to the youngest of the minors").

## Overbroad Laws Violate the First Amendment

205.    The Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, prohibits state statutes that punish a substantial amount of protected speech in the course of regulating unprotected speech. Such statutes are unconstitutionally overbroad. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002).

206.    Overbreadth challenges are an important tool to protect First Amendment rights when a law restricts and chills a substantial amount of protected speech. *Id.*

207.    A statute that burdens otherwise-protected speech is invalid as overbroad if a "substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." Moody v. NetChoice, LLC, 603 U.S. 707, 723 (2024).

208.    Restrictions on speech are also content-based—and subject to the most exacting judicial scrutiny—when they regulate expression "based on the topic discussed, or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Statutory provisions restricting "indecent" and "patently offensive" communications are classic examples of such content-based blanket restrictions. *Reno v. Am. C.L. Union*, 521 U.S. 844, 849, 868 (1997).

**Authors, and Students Have Standing to Challenge Book Bans**

209.    The Supreme Court has recognized that authors and publishers have standing to challenge regulations that prohibit them from reaching their intended audience or impose financial disincentives on their work. *See Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) (holding that publishers could challenge prison regulations limiting access to written materials); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (explaining that publishers and authors are interchangeable with respect to making First Amendment challenges to laws that impose content-based restrictions).

210.    Similarly, student plaintiffs have standing to challenge regulations that unreasonably interfere with their First Amendment right to access and receive constitutionally protected information and ideas from school library books and in school settings. *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see also* ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd., 557 F.3d 1177, 1195 (11th Cir. 2009) (finding parent had standing to sue on behalf of child over the removal of a particular school library book).

## CLAIMS FOR RELIEF

### First Cause of Action
### Unreasonable Overbroad Content-Based Restriction by Author Plaintiffs Against All Defendants
(First and Fourteenth Amendments, 42 U.S.C. § 1983)

211.    Plaintiffs incorporate all foregoing allegations as if fully set forth herein.

212.    The Per Se and Statewide Bans violate the First Amendment rights of the Author Plaintiffs by creating unreasonable content-based restrictions that prevent their books from reaching their intended young adult audience.

213.    The Per Se and Statewide Bans require removal of any book containing a single description of sexual conduct, regardless of the work's serious literary, artistic, political, or scientific value taken as a whole.

214.    These restrictions operate as content-based regulations because they target books based solely on their subject matter—whether they contain descriptions of sexual conduct.

215.    The standard courts use to assess the removal of school library books is consistent with the standard courts use to assess speech restrictions in nonpublic forums, where content-based restrictions must be both reasonable in light of the forum's purpose and viewpoint-neutral.

216.    The Per Se and Statewide Bans fail this standard because they bear no reasonable relationship to the educational purpose of school libraries, which is to provide diverse materials that help students explore ideas and gain understanding about the world.

217.    The constitutional violations become clear when examining what the Per Se and Statewide Bans actually accomplish. Utah already prohibits truly obscene materials through other provisions of the same law that properly apply the *Miller* test's three-prong analysis.

218.    The Per Se and Statewide Bans serve no purpose other than removing additional books that are not obscene as to older minors and remain fully protected by the First Amendment.

219.    Even more so considering that Utah's school library materials have long been curated by trained educators and librarians based on comprehensive LEA policies and procedures, learning objectives and individual student needs, and the bounds of the First Amendment.

220.    The Per Se and Statewide Bans are unconstitutionally overbroad because, to the extent they remove anything not already barred under the statute's other obscenity provisions, they do so by sweeping away protected speech. As such, a substantial number of the Per Se and Statewide Bans' applications are unconstitutional, judged in relation to their plainly legitimate sweep (if any).

221.    Award-winning works by Nobel Prize winners, National Book Award finalists, and Presidential Medal of Freedom recipients have been removed not because they lack literary merit, but because they acknowledge that topics like human sexuality and sexual assault exist as part of the broader human experience they explore.

222.    This categorical approach violates established constitutional principles.

223.    The Author Plaintiffs seek declaratory judgment that the Per Se and Statewide Bans violate the First Amendment and permanent injunctive relief preventing their further enforcement.

<u>**Second Cause of Action**</u>
**Unreasonable Overbroad Content-Based Restriction by Student Plaintiffs Against All Defendants**
(First and Fourteenth Amendments, 42 U.S.C. § 1983)

224.    Plaintiffs incorporate all foregoing allegations as if fully set forth herein.

225.    The Per Se and Statewide Bans violate the First Amendment rights of the Student Plaintiffs by creating unreasonable content-based restrictions that deny them access to constitutionally protected literature in their school libraries.

226.    The Per Se and Statewide Bans require removal of any book containing a single description of sexual conduct, regardless of the work's serious literary, artistic, political, or scientific value taken as a whole.

227.    These restrictions operate as content-based regulations because they target books based solely on their subject matter—whether they contain descriptions of sexual conduct.

228.    The standard courts use to assess the removal of school library books is consistent with the standard courts use to assess speech restrictions in nonpublic forums, where content-based restrictions must be both reasonable in light of the forum's purpose and viewpoint-neutral.

229.    The Per Se and Statewide Bans fail this standard because they bear no reasonable relationship to the educational purpose of school libraries, which is to provide diverse materials that help students explore ideas and gain understanding about the world.

230.    The constitutional violations become clear when examining what the Per Se and Statewide Bans actually accomplish. Utah already prohibits truly obscene materials through other provisions of the same law that properly apply the *Miller* test's three-prong analysis.

231.    The Per Se and Statewide Bans serve no purpose other than removing additional books that are not obscene as to older minors and remain fully protected by the First Amendment.

232.    Even more so when considering that Utah's school library materials have long been curated by trained educators and librarians based on comprehensive LEA policies and procedures, learning objectives and individual student needs, and the bounds of the First Amendment.

233.    The Per Se and Statewide Bans are unconstitutionally overbroad because, to the extent they remove anything not already barred under the statute's other obscenity provisions, they do so by sweeping away protected speech. As such, a substantial number of the Per Se and Statewide Bans' applications are unconstitutional, judged in relation to their plainly legitimate sweep (if any).

234.    Award-winning works by Nobel Prize winners, National Book Award finalists, and Presidential Medal of Freedom recipients have been removed not because they lack literary merit, but because they acknowledge that topics like human sexuality and sexual assault exist as part of the broader human experience.

235.    This categorical approach violates established constitutional principles.

236.    The Student Plaintiffs seek declaratory judgment that the Per Se and Statewide Bans violate the First Amendment and permanent injunctive relief preventing their further enforcement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Set a hearing at its earliest convenience as required by Federal Rule of Civil Procedure 57 for determination of their declaratory judgment claim;

B. Order permanent injunctive relief restraining Defendants, their officers, agents, employees, attorneys, and all persons in active concert or participation with them from enforcing the Per Se and Statewide Bans;

C. Declare the Per Se and Statewide Bans facially unconstitutional under the First and Fourteenth Amendments to the United States Constitution;

D. Order all books removed from school shelves pursuant to the Per Se and Statewide Bans to be immediately returned to the respective shelves from which they were removed;

E. Award Plaintiffs' costs of suit and reasonable attorney fees and other expenses under 42 U.S.C. § 1988;

F. Grant any such additional relief as the Court deems just.

DATED this 5th day of February, 2026.

_/s/ Thomas J. Ford_
Thomas J. Ford
Jason M. Groth
Masami T. Kanegae
Abigail Cook
**ACLU of Utah Foundation, Inc.**

David C. Reymann
Jascha K. Clark
**PARR BROWN GEE & LOVELESS**


Richard A. Van Wagoner
Melinda K. Bowen
**SPENCER FANE LLP**

*Attorneys for Plaintiffs*

David M. Given*
**COUNSEL LLP**

*\*Admitted Pro Hac Vice
Attorney for Plaintiff Caged Bird Legacy*